In re Robert J. LILIENFELD, Debtor.

PAN AMERICAN BANK, N.A., etc.

v.

Robert J. LILIENFELD, Defendant.

Bankruptcy No. 82–01683–BKC–JAG.

Adv. No. 83–0038–BKC–JAG–A.

United States Bankruptcy Court, S.D. Florida.

Jan. 23, 1984.

J. Stephen Menton, Smathers & Thompson, Miami, Fla., for plaintiff.

Stephen Judson, Miami, Fla., Trustee.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This matter was tried on October 19, 1983 on the complaint of the Pan American Bank objecting to the dischargeability of Robert Lilienfeld's debt to it. The debtor appeared *pro se* in these proceedings.

The debt in question in this adversary arose from a Visa charge account which was opened on October 16, 1981. The debt-

or has never made a single payment on the account and exceeded his credit limit of $1,000 in the first month. The account was not revoked nor the card put on the "hot list" until May 22, 1982. Although an officer of the bank testified that it was the practice of the bank to send out warning letters as soon as the credit limit had been exceeded, he could not testify that such a letter was sent to the debtor in this case. A bank employee called the debtor in early May 1982 to tell him the account was cancelled, at which time the debtor said he would not surrender his card and that he did not have the money at that time, but that he would pay later. The testifying bank officer also called the debtor at about that time to tell him that the account was cancelled, but a letter of cancellation (Plaintiff's Exhibit No. 2) was not mailed until June 17, 1982. There were a number of charges subsequent to that date, but the bank was reimbursed by merchants for most of them. The total debt to the bank, all of which the bank claims is non-dischargeable, is $10,875.65.

As evidence that the debtor intended to defraud the bank through the use of this credit card, the bank demonstrated that the statements for the debtor's account (Plaintiff's Composite Exhibit No. 1) show a pattern of most purchases being under $50 (with the inference that the debtor was avoiding having merchants call in to check on the credit card) and that many of these "small" charges occurred at the same locations on the same date. The bank also produced the former partner of the debtor, Peter Sandberg, who testified that the debtor had not been working, and, needing money during October to December of 1981, the debtor "sent away" for numerous credit cards, stating to Sandberg that he did not intend to pay and that he intended to take bankruptcy.

The debtor is an accountant who had a drug problem and was essentially not working during more than a year prior to his filing bankruptcy on August 27, 1982. In 1980 his adjusted gross income was $48,000 (Defendant's Exhibit A). Lilienfeld testified that in 1981 to May 1 his income was $30,000 but that then he was divorced and began taking drugs and became unable to work. During May or June of 1981 he requested that his then-partner hire Peter Sandberg to handle the work which Lilienfeld was unable to do. Later the partner felt that Sandberg should be fired as an incentive to force Lilienfeld to work, and since Lilienfeld felt unable, he and Sandberg entered into a partnership in August of 1981. Lilienfeld also testified that despite his being upset over the divorce which occurred in June, he continued to carry his share of the work and only slowed down in July or August of 1981.

Lilienfeld denies having the intention to file bankruptcy rather than repay his credit cards. He admits that the total amount he charged without repayment was "ridiculous" but testified that the bank, through its officer Fozzio, permitted him to make use of the card in this manner and that Lilienfeld had the intention of repaying the money when he was finally able to do so. He testified that he did not know what the dollar limit per charge was to avoid a merchant calling to have a charge approved, and he testified that he made numerous charges at the Four Ambassadors Hotel and at shops in the hotel because he lived there at the time. He conferred with an attorney about filing bankruptcy in April of 1982 but testified that at that time he hoped to solve his problems by merging with a C.P.A. firm which could handle his clients until he himself was able to. Only in August did he decide it was hopeless, and file bankruptcy.

Neither party produced Fozzio. Contrary to Lilienfeld's testimony, Sandberg testified that when he and Lilienfeld went to the bank in October of 1981 in an attempt to obtain a loan for the business, Fozzio refused to see them and did not return their telephone calls.

The plaintiff alleges that the credit which the debtor received was obtained by fraud or false pretenses, and therefore the debt should not be discharged. 11 U.S.C. § 523(a)(2) excepts from discharge debts for obtaining an extension or renewal of

credit by false pretenses, a false representation or actual fraud. If the false representation is contained in a financial statement, it is covered by § (B) which requires that there be a materially false statement regarding the debtor's financial condition, that the debtor made the false statement with the intent to deceive, and that the creditor reasonably relied on the false statement. False representations not included in a financial statement are covered by § (A) which does not itemize the same elements as are listed in § (B), but case law under both this section and its predecessor under the Bankruptcy Act requires proof of the same elements.

■ Count 3 of the complaint alleges that the debtor made a false statement in his application for a credit card, but there was no evidence offered at trial regarding this application, so relief will be denied on Count 3.

■ The court finds that the debtor had the intent to defraud the creditor through the use of his credit card. There is a pattern of numerous purchases under $50, even up to a half dozen at a single location in one day. The court does not find credible the debtor's testimony that he was not aware of the $50 limit. The inference that Lilienfeld's practice of making many small purchases was so that no merchant would call the bank, is not sufficiently rebutted by the debtor's explanation that he made numerous charges at the Four Ambassadors Hotel and its shops because he lived there. Even if the debtor's charges were not calculated to avoid refusal, there can be no doubt that he knew at the time he made these charges that he was unable to pay and would be unable to pay at any time in the foreseeable future. As late as May of 1982 he told bank personnel that he was unable to pay at the time, although he did not want to surrender his credit card. Because of the circumstances as testified to by the debtor himself, as well as the testimony of his former partner, the court concludes that Lilienfeld had no present intention to pay at the time he initially applied for the credit card. The only direct evidence of the debtor's intent not to pay was the testimony of Peter Sandberg. Although the partnership was dissolved, there was no evidence of animosity between the partners and Sandberg would have no other motivation for giving such specific testimony. Nothing emerged at the trial which would reduce Sandberg's credibility. The debtor, on the other hand, not only has a strong motivation to see this debt discharged, but also admits himself that he was mentally incapacitated and forgetful throughout this period and until at least the summer of 1983. The court is therefore satisfied as to the element of intent.

■ Turning to the issues of exactly what the false representations were which were made by the debtor, and whether the lender reasonably relied on them, it has been recognized that bank credit card cases must be viewed somewhat differently from single transaction loans or extensions of credit. Cf. *First National Bank & Trust Co. in Macon v. Stewart, In Re Stewart,* 7 B.R. 551 (U.S.Bkrtcy.Ct., M.D.Ga.1980). There is no reliance by the creditor at the time the credit is actually extended, because at that time the debtor is dealing with a third party merchant. Similarly, because the creditor-bank does not become aware of a debtor's breach of the terms of the credit arrangement, for example, when the debtor makes charges above the credit limit, the bank is unable to immediately protect itself or take actions which would prevent the appearance of its ratification of the debtor's actions. It is the debtor's representations regarding his ability and intention to pay, made when the credit card is obtained, on which the bank relies. However, because it is an ongoing credit arrangement, the debtor's intentions and ability to repay may change, and these are communicated to the bank through the debtor's payment record. If it is, or should be, apparent to the bank that the debtor no longer has the intention or ability to pay, it cannot be said that the continued reliance by the bank on the original representations is reasonable. Further, if the debtor exceeds the credit limit set forth in the agreement, the bank may ac-

quiesce to the higher amount and, in effect, amend the agreement. Whether or not the bank has done so when it fails to take action against a debtor who has exceeded his credit limit is a fact question for the court. Therefore, even though a bank cannot be required to prove specific reliance at the time an individual charge is made, and cannot be bound by its course of action during the period in which it has no information about the charges made by a debtor, the actions which it takes or fails to take within a reasonable time *will* be considered by the court as to whether the bank reasonably relied on misrepresentations of the debtor in its continued extension of credit to the debtor.

In this case, although the debtor exceeded his credit limit in the first month, and never made a single payment, the bank took no action to revoke the extension of credit for six months, and it took them a month to notify the debtor by letter, after telephoning him. Under these circumstances there was no reasonable reliance by the bank after the initial period, and it must be concluded from its conduct that it waived its right to action on the misrepresentations made at the outset. Any charges made by the debtor subsequent to his receipt of the letter informing him that his account had been cancelled would be in a different category and would again be non-dischargeable. However, it is impossible to identify from the statements what, if any, charges were made by the debtor subsequent to that date that were not recouped by the bank from the party accepting the charge. Thus there is no evidence of any damages resulting to the bank from the charges in that category.

Therefore no amount will be held non-dischargeable.

Pursuant to Rule 9021(a) a Final Judgment incorporating these Findings and Conclusions will be entered this date.