**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 98-60693**

_____

**In The Matter Of:  CONSTANCE P. MERCER,**

**Debtor,**

**AT&T UNIVERSAL CARD SERVICES,**

**Appellant,**

**versus**

**CONSTANCE P. MERCER,**

**Appellee.**

_____

**Appeal from the United States District Court**
**for the Southern District of Mississippi**

_____

March 23, 2001

Before JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.[1]

RHESA HAWKINS BARKSDALE, Circuit Judge:

Rehearing en banc was granted to determine, for credit card debt (card-debt), the standards for bankruptcy nondischargeability under 11 U.S.C. § 523(a)(2)(A) (credit obtained by false pretenses/representation or actual fraud).  Primarily at issue are: whether credit card use (card-use) constitutes a _representation_ of

_____

[1]Chief Judge King is recused and did not participate in this matter.

intent to pay the loan thereby obtained (intent to pay); and, if so, whether the issuer may *justifiably rely* on it. AT&T Universal Card Services (UCS) appeals the district court's judgment affirming the bankruptcy court's decision that the debt from Constance P. Mercer's "pre-approved" UCS card is dischargeable. We **REVERSE** and **REMAND**.

I.

In September 1995, when Mercer received UCS' pre-approved card-solicitation, she was employed as a paralegal, having worked approximately 20 years; had a junior college degree and gross annual income of approximately $25,000; and was familiar with card accounts and how obligations arise with them. She had begun gambling in casinos in 1993; as of UCS' 1995 solicitation, she had developed a "gambling obsession", financed by winnings and cash advances through card-use. That year, she began having problems paying her bills and acquired at least six more cards (four before UCS' that November).

UCS' solicitation followed a screening process begun months earlier. The credit bureau listed prospects based on UCS criteria, such as total revolving debt, bankruptcies, and existing credit utilization; a risk score was established for each prospect. That score predicted the probability of an account, within a one-year period, being delinquent for 60-90 days or more. The maximum score

was 900; UCS required a minimum of 680. Mercer's was 735, evaluated at trial by UCS as "very good".

From the resulting prospects, an outside vendor eliminated duplicates and those who either had requested *not* to be solicited or were located in high fraud areas. Those remaining were matched against UCS' internal risk and scoring models. For those still remaining, the credit bureau screened again to ensure *no* change in credit history or standing. As the Fair Credit Reporting Act requires (according to UCS), UCS offered a pre-approved card to each post-second-screening prospect (including Mercer).

In September 1995, Mercer completed, signed, and returned her acceptance to UCS, providing, among other things, her income ($24,500) and identifying data, such as her social security number. UCS checked this information against its database. A third credit bureau screening determined Mercer's ability to service a $3,000 credit line (limit). Had there been *any* deterioration in credit history, UCS would have either withdrawn the offer or offered a lower limit.

On 10 November 1995, UCS opened Mercer's account, with a $3,000 limit, and provided a card and cardmember agreement (card-agreement). The agreement stated, *inter alia*: it was *effective upon card-use*; Mercer was "responsible for all amounts owed"; and she "agree[d] to pay such amounts according to the [card-

3

agreement's] terms" (by making at least a minimum payment in each billing cycle against the balance due).

Mercer reached her limit within a month of card-receipt, obtaining 14 cash advances. *Each was used for gambling*. Four were on or before 24 November, from an automatic teller machine (ATM) *at a casino*; nine, between 28 November and 11 December, from an ATM *at a bank*; and one, from another entity. On 29 November, 19 days after card-issuance but before Mercer reached her limit, her account was flagged by UCS for excessive transactions. UCS determined they were *not* egregiously excessive and cleared the account for further use.

Mercer's last card-use was on 11 December, only a month after card-issuance. Her first UCS monthly statement (through mid-December), reflected a balance approximately $200 over-limit. The minimum payment was *not* made.

The second statement requested the required payment and *no* card-use. When contacted twice in February by UCS, Mercer stated: she was trying to become current, and did *not* know when she could make a payment; later (62 days post last card-use), that she had consulted an attorney about bankruptcy. The final statement (ending mid-March) advised the account had been closed. Quarterly, UCS reviewed its customers' creditworthiness. But, because Mercer's limit had been reached during the first billing cycle, her review was irrelevant. Notwithstanding her claimed inability to

4

make the minimum payments, Mercer's *checking account statements* for that period reflect numerous ATM cash withdrawals, *including in casinos*. For example, that for 17 January 1996 reflected 26, totaling approximately $2,200.

On filing for Chapter 7 bankruptcy relief in April 1996, Mercer was indebted to nine card-issuers for more than $31,000. Most of those accounts (including with UCS) had been opened between March and December 1995. She had lost approximately $36,000 in gambling within two years prior to filing bankruptcy, including at least $25,000 in 1995, when her income from two jobs was approximately $24,000.

Following trial in 1997, Mercer's UCS debt was held dischargeable, the bankruptcy court ruling: for card-issuance, UCS relied on its own investigation, rather than on any representation by Mercer; therefore, UCS could *not* rely on her representation, "if any", at card-use; and, even assuming UCS *actually relied* on any Mercer representation, it would *not* have been *justifiable*, because UCS' pre-issuance investigation was inadequate. ***AT&T Universal Card Servs. v. Mercer (In re Mercer)***, 220 B.R. 315, 326-27 (Bankr. S.D. Miss. 1998).

The district court affirmed, ***AT&T Universal Card Servs. v. Mercer***, No. 1:98cv290BrR (S.D. Miss. 30 Sept. 1998) (unpublished), as did a divided panel on our court; but the majority could *not* agree. ***AT&T Universal Card Servs. v. Mercer (Matter of Mercer)***,

211 F.3d 214, *reh'g granted*, 218 F.3d 770 (5th Cir. 2000). One member concluded: UCS having provided a pre-approved card and limit, "Mercer could *not* make any false representations" on which UCS could rely; and it had *assumed the risk* of non-payment. 211 F.3d at 217 (Duhè, J.) (emphasis added). The other concluded: card-use is an *implied* promise to pay; but, UCS could *not justifiably rely* on it "without a reasonably adequate assessment of [Mercer's] credit history and present financial condition". ***Id***. at 218 (Dennis, J., specially concurring). The dissent concluded: card-use is a representation of intent to pay; and the case should be remanded for application of the correct justifiable reliance standard. ***Id***. at 231-32 (Barksdale, J., dissenting).

## II.

Although the amount of the debt at stake in this nondischargeability proceeding is relatively small, card-debt is involved in many consumer bankruptcies. Accordingly, it is imperative that we clarify the standards governing nondischargeability of card-debt.

Cards play a major role in, and promote, modern commerce. A few examples of their ever-increasing uses and importance follow. Cards are a convenient — if not necessary — substitute for cash and checks, especially where they are *not* a viable medium, such as in telephone and Internet purchases. *See* Todd J. Zywicki, ***The Economics of Credit Cards***, 3 CHAP. L. REV. 79, 83, 91-92 (Spring

6

2000).  They help small retailers compete with larger ones, many of which have their own credit operations, by allowing the former to shift the risk of non-payment to the issuer.  *Id*. at 92-93. Finally, cash advances, the focus of the case at hand, are a prompt, simple, and extremely convenient alternative to bank loans.

The downside for increased consumer credit is bankruptcy.  *See* David F. Snow, *The Dischargeability of Credit Card Debt:  New Developments and the Need for a New Direction*, 72 AM. BANKR. L.J. 63, 94 (Winter 1998) (readily available cards "tempt consumers, hard-pressed by loss of work, illness, or family difficulties, to attempt to tide themselves over and to postpone financial collapse or bankruptcy with little or no realistic prospect of success"). Filings increased from approximately 800,000 in 1990 to 1.4 million in 1998 (decreasing somewhat in 1999 and 2000).  *See* AMERICAN BANKR. INST., ANNUAL TOTAL BANKRUPTCY FILINGS FOR 1990-1999, *available at* <http://www.abiworld.org/stats/newstatsfront.html> (last checked 15 Mar. 2001).  "[B]ank, retail and credit-card industry advocates estimate consumer bankruptcies cost their businesses about $40 billion a year".  Dawn Kopecki & Jeffrey Taylor, *House, Senate Diverge on Bills For Bankruptcy*, WALL ST. J., 4 Feb. 2000, at A20. As expected, that cost is passed along to customers.  Bankruptcies are said to cost each United States household $400 annually, in part because, to recoup losses, issuers and other businesses increase customers' interest rates.  Julie Hyman, *Senate Set to*

7

*Pass Legislation to Curb Bankruptcy Abuse*, WASH. TIMES, 2 Feb. 2000, at B8.

Our court has *not* addressed the standards for card-debt § 523(a)(2)(A) nondischargeability (card-dischargeability). Numerous others have, with conflicting theories emerging. Because of the issue's importance, the need for a uniform standard, and the many subissues in this case, arising out of a pre-approved card being used to obtain funds for gambling, we address each element in detail.

In this regard, there is *no* statutory basis for distinguishing between cards obtained at the debtor's initiative and those obtained in response to a solicitation (pre-approved). Accordingly, although this case involves a pre-approved card, the standard we adopt — common-law fraud — is *not* so confined. Moreover, irrespective of how the debtor obtained the card, his intent to pay representation, and the creditor's (issuer's) actual reliance thereon, are the same. On the other hand, a card's pre-approval *may* be relevant as to whether that reliance was *justifiable*.[2]

Section 523(a)(2)(A) excepts from discharge, *inter alia*, "any debt ... for ... an extension ... of credit, to the extent obtained

---

[2]In addition, if the debtor applied for a card, at issue may be 11 U.S.C. § 523(a)(2)(B) (excepting debts for, *inter alia*, credit extension obtained by materially false written statement respecting debtor's financial condition on which creditor reasonably relied).

8

by ... false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's ... financial condition*". 11 U.S.C. § 523(a)(2)(A) (emphasis added). UCS contends that, with each card-use: Mercer knowingly falsely represented her intent to pay; and the bankruptcy court applied an incorrect standard in determining UCS failed to prove actual *and* justifiable reliance.

We apply the same standard of review as did the district court: the bankruptcy court's factual findings are reviewed for clear error; its legal conclusions and mixed questions of fact and law, *de novo*. *E.g.*, **Randall & Blake, Inc. v. Evans (Matter of Canion)**, 196 F.3d 579, 584 (5th Cir. 1999). But, of particular importance to this case, the clear error standard does *not* apply to findings of fact resulting from application of an incorrect legal standard. *See* **Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)**, 926 F.2d 1458, 1464 (5th Cir. 1991).

### A.

"The operative terms in § 523(a)(2)(A), ... 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art ... [and] are common-law terms". **Field v. Mans**, 516 U.S. 59, 69 (1995). "[W]here Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means

9

to incorporate the established meaning of these terms". *Id*. (internal quotation marks, ellipses, and citations omitted).

In *Field*, the debtor purchased real estate from the Fields; they provided financing, requiring their consent to a subsequent conveyance. *Id*. at 61-62. Failing consent, the balance was due. *Id*. at 62. *Without* the Fields' consent, the property was conveyed; *without* disclosing that, the debtor asked them to waive the balance-due provision. *Id*.

The sole issue before the Court was "the level of reliance that § 523(a)(2)(A) requires a creditor to demonstrate". *Id*. at 63. *Field* concerned "actual fraud", one of § 523(a)(2)(A)'s three nondischargeability bases. *Id*. at 69. Although "*not* mean[ing] to suggest that the requisite level of reliance would differ if there should be a case of false pretense or [false] representation but *not* of fraud", the Court did *not* settle the question. *Id*. at 70 n.8 (emphasis added).

For the common-law understanding of "actual fraud" in 1978 (when that term was added to § 523(a)(2)(A) by the Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2590), the Court looked to "the most widely accepted distillation of the common law of torts" — the Restatement (Second) of Torts. *Field*, 516 U.S. at 70. The Restatement, however, does *not* define "fraud", much less "actual fraud"; instead, it discusses "fraudulent misrepresentation".

10

Prior to *Field*, some courts defined differently § 523(a)(2)(A)'s three bases. *See, e.g.,* **Montgomery Ward & Co., Inc. v. Blackburn (In re Blackburn)**, 68 B.R. 870, 876 (Bankr. N.D. Ind. 1987). Likewise, our court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual fraud, as opposed to false pretenses/representation. *See* **RecoverEdge L.P. v. Pentecost**, 44 F.3d 1284, 1292-93 (5th Cir. 1995) (*for false pretenses/representation*, knowing and fraudulent falsehood describing past or current facts that creditor relied upon; *for actual fraud*, knowingly false representation with intent to deceive creditor, who relied on it and therefore sustained loss). We are *not* required to address whether such distinctions survived **Field**.[3]

UCS did *not* specify on which of the three bases it relied. It has contended throughout, however, that, similar to the earlier listed elements for "actual fraud" described in **Pentecost**, Mercer made a knowingly false representation, with intent to deceive, upon which it relied in extending her credit. Both parties have briefed those elements. Likewise, most courts considering card-

---

[3]*Compare, e.g.,* **F.C.C. Nat'l Bank v. Reid (In re Reid)**, 237 B.R. 577, 583 (Bankr. W.D.N.Y. 1999) ("actual fraud" *not* limited to misrepresentation/reliance test; § 523(a)(2)(A)'s three bases are separate categories) *with* **LA Capitol Fed. Credit Union v. Melancon (In re Melancon)**, 223 B.R. 300, 307 & n.4 (Bankr. M.D. La. 1998) (same standard should apply).

dischargeability have applied elements similar to those described in **Pentecost** for "actual fraud".[4]

Those elements are appropriate for determining card-dischargeability because, as discussed *infra*, card-use lends itself to that analysis. Accordingly, for each card-use, and by a preponderance of the evidence, **Grogan v. Garner**, 498 U.S. 279, 287 (1991), UCS was required to prove: (1) Mercer made a representation; (2) it was knowingly false; (3) it was made with the intent to deceive UCS; (4) UCS actually *and* justifiably relied on it; and (5) UCS sustained a loss as a proximate result of its reliance.

B.

Resolution of the issue at hand requires examining **Davison-Paxon Co. v. Caldwell**, 115 F.2d 189 (5th Cir. 1940), *cert. denied*, 313 U.S. 564 (1941), which held: excepted from discharge were only debts obtained by "actual *overt* false pretense or representation", *not* those "created by obtaining credit through *concealment* of insolvency and present inability to pay". **Id**. at 191 (emphasis added). "The rationale underlying **Davison-Paxon** has been severely eroded in the modern world of credit transactions and the decision

---

[4]*See, e.g.*, **Household Credit Servs., Inc. v. Ettell (In re Ettell)**, 188 F.3d 1141, 1144 (9th Cir. 1999); **Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)**, 141 F.3d 277, 280-81 (6th Cir.), *cert. denied*, 525 U.S. 978 (1998); **Universal Bank, N.A. v. Grause (In re Grause)**, 245 B.R. 95, 99 (8th Cir. B.A.P. 2000).

12

has been the subject of much criticism." ***Sears, Roebuck & Co. v. Boydston (Matter of Boydston)***, 520 F.2d 1098, 1101 (5th Cir. 1975).

***Davison-Paxon*** was governed by § 523(a)(2)(A)'s predecessor, § 17(a)(2) of the Bankruptcy Act of 1898. It excepted, *inter alia*, "liabilities for obtaining money or property by false pretenses or false representations". 11 U.S.C. § 35(a)(2) (repealed 1979); *see* ***Field***, 516 U.S. at 64-65 & n.5. "Actual fraud" was added as a nondischargeability basis, some suggest, in order to eliminate ***Davison-Paxon***'s distinction between "overt" and "implied" misrepresentation.[5] Since the amendment, ***Davison-Paxon*** has caused confusion among our circuit's bankruptcy courts.[6]

When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an *overt act* is *not* required. *See* RESTATEMENT (SECOND) OF TORTS, §§ 550, 551; ***Citibank***

---

[5]*See, e.g.*, ***First Nat'l Bank of Mobile v. Roddenberry***, 701 F.2d 927, 930 n.3 (11th Cir. 1983) (citing Zaretsky, ***The Fraud Exception to Discharge Under the New Bankruptcy Code***, 53 AM. BANKR. L.J. 253, 257 (1979)); ***Reid***, 237 B.R. at 586.

[6]*See, e.g.*, ***Melancon***, 223 B.R. at 312-15 (***Davison-Paxon*** obsolete due to addition of actual fraud and ***Field***'s adoption of common-law interpretation); ***AT&T Universal Card Servs. v. Samani (In re Samani)***, 192 B.R. 877, 879-80 (Bankr. S.D. Tex. 1996) (allowing creditor to establish fraud based on card-use representation of intent and ability to pay would directly contravene ***Davison-Paxon***); ***Louisiana Nat'l Bank of Baton Rouge v. Talbot (In re Talbot)***, 16 B.R. 50, 54 (Bankr. M.D. La. 1981) (bound by ***Davison-Paxon***); ***Ranier Bank v. Poteet (In re Poteet)***, 12 B.R. 565, 568 (Bankr. N.D. Tex. 1981) (***Davison-Paxon*** *not* relevant to card-use).

*(S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996).  Moreover, a misrepresentation need *not* be spoken; it can be made through conduct.  *See id*. § 525 cmt. b.  Accordingly, *Davison-Paxon* retains *no* validity; it is overruled.

C.

"The difficulty in credit card cases is for the creditor, who does *not* deal face-to-face with the debtor, to prove the elements of *misrepresentation* and *reliance*."  *Eashai*, 87 F.3d at 1087 (emphasis added); *see also* **AT&T Universal Card Servs. Corp. v. Feld (In re Feld)**, 203 B.R. 360, 365-66 (Bankr. E.D. Pa. 1996).  The bankruptcy court's finding *no* actual *and* justifiable reliance on any representations by Mercer was premised on an erroneous interpretation of the law.  It did *not* address the other elements for card-dischargeability.

Based on our review, UCS has proved three of the five elements and part of another; for the balance, we must remand for fact-finding.  Through each card-use, Mercer represented her intent to pay.  A question of fact for remand is whether the representation was knowingly false.  If so, intent to deceive is present.  In authorizing the loan, UCS *actually* relied on the representation; whether that was *justifiable* is a question of fact for remand.  Finally, UCS' loss (unpaid loan) was proximately caused by its reliance.

14

1.

A representation of intent to pay was made at card-use, *not* at card-issuance. Mercer's card being pre-approved did *not* preclude the representation.

Many earlier cases held that, by card-use, the debtor represented both *intent and ability* to pay.[7] The "ability" factor has been criticized for improperly shifting the burden of proof, making the debtor a guarantor of her financial condition,[8] and because it gives preferential treatment to issuers, making card-debt too easily nondischargeable.[9] Moreover, even if card-use could be understood as a representation *not* only of intent, but also *ability*, to pay, the latter is *not* actionable under § 523(a)(2)(A); as noted, it excludes from its scope "a statement respecting the debtor's ... *financial condition*". 11 U.S.C. § 523(a)(2)(A) (emphasis added).[10]

---

[7]*See, e.g.*, **First Card Servs., Inc. v. Flynn (In re Flynn)**, 184 B.R. 8, 9 (Bankr. E.D.N.Y. 1995); **Citibank (S.D.), N.A. v. Rodriguez (In re Rodriguez)**, 138 B.R. 112, 114 (Bankr. S.D. Fla. 1992); **Poteet**, 12 B.R. at 567.

[8]See, *e.g.*, **Sears, Roebuck & Co. v. Hernandez (In re Hernandez)**, 208 B.R. 872, 880 (Bankr. W.D. Tex. 1997); **Chase Manhattan Bank, N.A. v. Ford (Matter of Ford)**, 186 B.R. 312, 317 (Bankr. N.D. Ga. 1995).

[9]*See, e.g.*, **Chase Manhattan Bank (U.S.A.) N.A. v. Carpenter (Matter of Carpenter)**, 53 B.R. 724, 728 (Bankr. N.D. Ga. 1985).

[10]*See, e.g.*, **Rembert**, 141 F.3d at 281; **Anastas v. American Sav. Bank (In re Anastas)**, 94 F.3d 1280, 1285 (9th Cir. 1996); **Citibank (S.D.), N.A. v. Senty (In re Senty)**, 42 B.R. 456, 459 (Bankr.

15

Many, more recent, cases hold that card-use is a representation of intent to pay (with payments pursuant to the card-agreement schedule).[11] When the representation is confined to *intent*, *not ability, to pay*, there is *no* risk it will have the undesirable consequence of making the debtor a guarantor of her financial condition.[12] Mercer apparently agrees. In her appellate briefs, she implicitly concedes that, with each card-use, she represented her intent to pay. On the other hand, several bankruptcy courts have held card-use is *not* a representation. For example, **AT&T Universal Card Servs. v. Alvi (In re Alvi)**, 191 B.R. 724, 731 (Bankr. N.D. Ill. 1996) (emphasis added), held it "involves *no* representation, express or implied".[13]

**Alvi**, 191 B.R. at 731-32, relied on **Williams v. United States**, 458 U.S. 279 (1982). Williams had been charged with a crime under 18 U.S.C. § 1014 (knowingly false statement to influence action of certain financial institutions). **Id**. at 282. Applying the rule of

_____

S.D.N.Y. 1984).

[11]*See, e.g.*, **Rembert**, 141 F.3d at 281; **Anastas**, 94 F.3d at 1285.

[12]*See* **Chevy Chase Bank, FSB v. Briese (In re Briese)**, 196 B.R. 440, 450 & n.16 (Bankr. W.D. Wis. 1996).

[13]*See also, e.g.*, **Universal Bank, N.A. v. Rich (In re Rich)**, 249 B.R. 709, 715-16 (Bankr. N.D. Tex. 2000) (citing **Alvi**); *cf*. **FCC Nat'l Bank v. Etto (In re Etto)**, 210 B.R. 734, 739-40 (Bankr. N.D. Ohio 1997) (where card pre-approved and issued without credit check, card-use *not* promise to pay).

16

lenity, the Court rejected the Government's contention that "a drawer [of a check] is generally understood to represent ... he 'currently has funds on deposit sufficient to cover'" it, *id*. at 285, 290, holding:  "a check is *not* a factual assertion at all, and therefore *cannot* be characterized as 'true' or 'false'", and thus "did *not* ... make any representation as to the state of [Williams'] bank balance".  *Id*. at 284-85 (emphasis added).  *Alvi* reasoned: "[t]he similarities between the issuance of a check" and card-use compel concluding that ordinary card-use is *not* a representation; accordingly, card-use "in [and] of itself is *not* capable of being true or false".  *Alvi*, 191 B.R. at 732 (emphasis added).

*Williams* does *not* compel that conclusion.  Even assuming a check is a representation of sufficient funds, this would be a statement respecting financial condition, *not* actionable under § 523(a)(2)(A).  In any event, the drawer does *not* request an extension of credit *from his bank*; instead, he draws on *his funds on deposit*.  If they are *not* sufficient to cover the check, the bank will *not* honor it.  Because the drawer is *not* seeking an extension of credit from his bank, he is *not* making a representation, by check-use, of intent to pay a loan from his bank.  On the other hand, card-use is both a request to the issuer for a loan against a line of credit and a promise to pay.  Inherent in the loan's being made (and the consideration therefor) is that promise; without it, there is *no* loan, merely a gift.  *See* **LA**

17

*Capitol Fed. Credit Union v. Melancon (In re Melancon)*, 223 B.R 300, 311 (Bankr. M.D. La. 1998). Moreover, *Field*, decided after, and unlike, *Williams*, concerns a civil statute. *Field* directed that § 523(a)(2)(A) be interpreted in accordance with the common law.[14]

We agree with the Ninth Circuit that each card-use forms a unilateral contract: the holder "*promises* to repay the debt ... and the ... issuer *performs* by reimbursing the merchant who ... accepted the ... card in payment". *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996) (emphasis added); *see* RESTATEMENT (SECOND) OF CONTRACTS § 31 cmt. b (where each loan is "the sole consideration for the corresponding part of the [continuing] guaranty [for future loans], the guaranty is often characterized as an offer for a series of separate contracts"), *cited* in *Anastas*, 94 F.3d at 1285.[15] Mercer understood that, on

---

[14]Judge Duhé's discussion of *Williams* overlooks the most fundamental distinction between card-use and payment by check: as discussed above, card-use is a loan-request against a line of credit, an inherent part of which is a promise to repay; a check is *neither* a loan-request *nor* a promise to repay.

[15]*See also, e.g.*, *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1086-87 (6th Cir. 1988) (Merritt, J., dissenting) (card relationship is issuer's offer for series of unilateral contracts formed with each card-use (citing RESTATEMENT (SECOND) OF CONTRACTS § 31)); *AT&T Universal Card Servs. Corp. v. Searle*, 223 B.R. 384, 389 (D. Mass. 1998) (*Anastas* unilateral contract approach consistent with words or conduct forming representation, with it inherent in transaction); *cf.* *Goldman v. First Nat'l Bank of Chicago*, 532 F.2d 10, 18 & n.13 (7th Cir.) (under Consumer Credit Protection Act, *no* extension of credit until

18

card-issuance, UCS established a line of credit for her, providing the *opportunity* to obtain goods, services, and cash from entities with which UCS had contracted, with UCS reimbursing the merchants and looking to her for payment. Her card-agreement provided, *inter alia*: card-use signified acceptance of the agreement, including the obligation to pay the charges by making at least the minimum monthly payments.

Of course, by card-acceptance, Mercer was *not* obligated to use that credit. But, by card-use, she requested a loan against that line; and, by approving each card-use, and therefore reimbursing the merchant, including an ATM owner, UCS made a loan to her. *See* **Melancon**, 223 B.R. at 311. Her promise to pay occurred *not* when the line was established, but at card-use, when the loan was made. *See* **id**. With each card-use, Mercer did *not* say anything to UCS. Again, her card-use (*conduct*) was a loan request and promise to pay. *See* **Feld**, 203 B.R. at 367 (absence of express statement with card-use "completely consistent with fraud doctrine", which recognizes *representation can be made through conduct*).

The common law of fraud supports a representation through card-use. The Restatement does *not* define "representation"; it

---

card-use), *cert. denied*, 429 U.S. 870 (1976). *But see* **Feld,** 203 B.R. at 366-67 (card-use does *not* create separate contract; instead, it is anticipated performance of contract created at card-issuance, similar to draw on line of credit; instead of new representation with each card-use, representation of intent to pay continues while card used).

does define "misrepresentation", which "denote[s] *not only* words spoken or written but also *any other conduct* that amounts to an assertion *not* in accordance with the truth". RESTATEMENT (SECOND) OF TORTS, § 525 cmt. b (emphasis added). A misrepresentation can be one of "*fact*, opinion, *intention* or law". *Id*. § 525 (emphasis added).

If, as here, the misrepresentation concerns *intention* to perform an agreement, that intention "*may be expressed* but it is *normally merely to be implied* from the making of the agreement". *Id*. § 530 cmt. c (emphasis added). "[A] promise *necessarily* carries with it the *implied assertion* of an *intention to perform*". *Id*. (emphasis added). Accordingly, Mercer's card-use representation included her "*implied assertion* of an intention to perform". *Id*. (emphasis added).

Likewise, it is of *no* moment that, with card-use, Mercer did *not* deal directly with UCS, but instead with the merchant (including through an ATM machine) which accepted her card. Based on her testimony, Mercer "intend[ed], or ha[d] reason to expect [her card-use representation would be] *communicated to [UCS], and that it [would] influence [UCS'] conduct*". *Id*. § 533 (emphasis added).[16]

---

[16]*See also **Feld***, 203 B.R. at 367 (representation of intent to pay transmitted to issuer even though *not* party to transaction; because at some point issuer must be notified transaction occurred,

Scienter distinguishes "actual" or "positive" fraud from "constructive" fraud, or that "implied by law"; fraud actionable under § 523(a)(2)(A) is the "positive" type. *See, e.g.*, **Ames v. Moir**, 138 U.S. 306, 311 (1891) ("fraud in the act ... defining [nondischargeability] ... means positive fraud, *or fraud in fact, involving moral turpitude or intentional wrong,* ... and *not* implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality" (emphasis added; internal quotation marks omitted)); **Anastas**, 94 F.3d at 1286 (same under § 523(a)(2)(A)); **Pentecost**, 44 F.3d at 1292 (same). Inferring, from card-use, a representation of intent to pay does *not* violate this principle; under § 523(a)(2)(A), the creditor still must prove all of the other elements of fraud, including scienter (knowingly false representation).[17]

---

it will receive any accompanying representation; therefore, issuer's *failure to acquire contemporaneous knowledge* of debtor's affirmation of intent to pay *not* fatal); **Briese**, 196 B.R. at 450 (although debtor, through card-use, may not speak directly to issuer, "debtor makes a representation — namely, the promise to pay for the credit advanced").

[17]Holding card-use is a representation of intent to pay is *not* a "fiction", as Judge Duhé asserts, but is, instead, consistent with the Restatement's above-discussed position that a *representation can be made through conduct. See* RESTATEMENT (SECOND) OF TORTS § 525 cmt. b. In so holding, we do *not* ignore the principle that exceptions to discharge are narrowly construed. That principle seeks to further the goal of providing the debtor a "fresh start". *See* **Miller v. J.D. Abrams Inc. (Matter of Miller)**, 156 F.3d 598, 602 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999). By enacting § 523(a)(2)(A), Congress made clear its intent to limit the "fresh start" to honest, but unfortunate, debtors, *not*

The appropriate focus with respect to a debtor's intent is whether she acted in bad faith by knowingly making a false representation. The bankruptcy court did *not* address whether Mercer's representations were knowingly false. "A misrepresentation is fraudulent if the maker ... knows or believes ... the matter is *not* as" represented, or "does *not* have the confidence in the accuracy of his representation" as stated or implied, or "knows ... he does *not* have the basis for his representation" as stated or implied. RESTATEMENT (SECOND) OF TORTS § 526 (emphasis added). "A representation of the maker's own intention to do ... a particular thing is fraudulent if he does *not* have that intention." *Id*. § 530(1) (emphasis added). "If he does *not* have it, he must of course be taken to know that he does *not* have it." *Id.* § 530 cmt. b (emphasis added)*; see also* **Melancon**, 223 B.R. at 319 ("one always knows his present intentions").

a.

The card-use representation of intent to pay is false if there is use *without* that intent. *See, e.g.*, **Anastas**, 94 F.3d at 1285; **American Express Travel Related Servs. Co., Inc. v. Hashemi (In re Hashemi)**, 104 F.3d 1122, 1126 (9th Cir.), *cert. denied*, 520 U.S.

---

perpetrators of fraud. *See, e.g.*, **Grogan**, 498 U.S. at 286-87. Accepting Judge Duhé's view that card-use includes *no* representation of intent to pay would undermine this equally important principle of bankruptcy law.

1230 (1997). Many courts have listed various factors to consider in determining whether the card-user's representation was made with the requisite scienter. In *Eashai*, 87 F.3d at 1090, the Ninth Circuit referenced the 12 factors listed in *Citibank S.D., N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. B.A.P. 1988): the time between card-use and the bankruptcy filing; whether, prior to card-use, an attorney was consulted about bankruptcy; the number of charges; their amount; the debtor's financial condition at card-use; whether the limit was exceeded; whether multiple charges were made on the same day; whether the debtor was employed; her employment prospects; her financial sophistication; whether her buying habits changed suddenly; and whether luxuries or necessities were purchased. *See also, e.g.*, *Rembert*, 141 F.3d at 282; *Feld*, 203 B.R. at 367 & n.9. Others have rejected their use.[18]

We agree with the Ninth Circuit that such "factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number" to constitute fraudulent intent. *Hashemi*, 104 F.3d at 1125. In most instances, a bankruptcy court's consideration of these factors will be helpful. It should consider them, together with any other facts and circumstances it may find

---

[18]*See, e.g.*, **American Express Travel Related Servs. Co., Inc. v. Christensen (In re Christensen)**, 193 B.R. 863, 866 (N.D. Ill. 1996) (multi-factor "objective" test inconsistent with common-law "subjective" standard); **Alvi**, 191 B.R. at 733 (factors do *not* address critical subjective intent).

proper, in determining whether, at card-use, the debtor knew her representation was false.

In this regard, and as the Ninth Circuit has stressed, the debtor's financial condition at card-use is only *one* of many factors to consider, and should *not* be the *sole basis* for finding fraudulent intent. **Anastas**, 94 F.3d at 1285-86.[19] Our precedent in **Boydston**, 520 F.2d 1098, is *not* at odds with this.

**Boydston** concerned credit purchases; the creditors claimed the debts were nondischargeable under the predecessor to § 523(a)(2)(A), asserting acquisition with *no* intent to pay. **Id**. at 1099-1100. The bankruptcy court found they failed to establish subjective intent *not* to pay; our court found *no* clear error. But, it stated: "where hopeless insolvency at the time of the purchases makes payment impossible, fraudulent intent *may* be inferred". **Id**. at 1101 (emphasis added). Although this appears to conflict with the Ninth Circuit's much later statement in **Anastas**, the point being made in **Boydston** was that hopeless insolvency, when the charges were made, was "merely *one* method of establishing" the debtor's "*subjective intent not to pay*". **Boydston**, 520 F.2d at 1101 (emphasis added).

---

[19]*See also, e.g.*, **Chase Manhattan Bank v. Murphy (In re Murphy)**, 190 B.R. 327, 332 n.6 (Bankr. N.D. Ill. 1995) (intent to pay *not* synonymous with ability to pay; "[a]lone, financial inability to repay does not establish fraudulent intent").

To the extent **Boydston** could be interpreted as *requiring* a bankruptcy court to infer fraudulent intent *solely* on the basis of "hopeless insolvency" at card-use, it would be inconsistent with the Restatement.  It requires, instead, that the inquiry focus on the debtor's *subjective intent*, with such "hopeless insolvency" simply being "evidence from which his lack of honest belief *may* be inferred".  RESTATEMENT (SECOND) OF TORTS § 526 cmt. d (emphasis added); *see also* **Feld**, 203 B.R. at 365 (**Field** and Restatement make clear that, under common law, *subjective standard* must be applied in determining fraudulent intent).

Accordingly, "hopeless insolvency", or inability to pay, at card-use *may* support finding the debtor did *not* intend to pay, but *only* if she was aware of her financial condition and knew she *could not* (and therefore did *not* intend to) make even the minimum monthly payment to the issuer.  *See* RESTATEMENT (SECOND) OF TORTS § 530 cmt. d (intention *not* to perform "may be shown by any ... evidence that sufficiently indicates its existence, as, for example, the certainty that he would *not* be in funds to carry out his promise" (emphasis added)); **Melancon**, 223 B.R. at 321 ("If the debtor has *no* idea how the money will get paid back, or if it will get paid back, then he may hope to repay — he may even want to repay — but he certainly does *not* intend to repay." (emphasis added)).

A debtor rarely will admit card-debt is incurred with the intention of *not* paying it; therefore, the creditor may rely on

25

circumstantial evidence to prove the debtor's state of mind at card-use.[20]  In order to prove a debtor's fraudulent intent under § 523(a)(2)(A), the creditor must present sufficient evidence to convince the trier of fact that, as discussed, the debtor made the statement of intent in bad faith — that is, knowing it was false. *Pentecost*, 44 F.3d at 1292.  In this regard, the aim of the objective factors enumerated *supra* is to discern the debtor's *subjective* intent.  ***Citibank (S.D.), N.A. v. Michel***, 220 B.R. 603, 606 (N.D. Ill. 1998) ("[o]bviously the court must consider evidence that is probative of the debtor's intent to repay in addition to considering the debtor's demeanor, but the ultimate inquiry still seeks to determine the debtor's subjective intent").  Ultimately, in cases such as this one, where a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent.  *See **Matter of Sheridan***, 57 F.3d 627, 633-34 (7th Cir. 1995) (while certain objective circumstantial evidence may support an inference of fraud, it does *not* compel such a conclusion when the trial judge finds the debtor's contrary testimony to be credible).  Accordingly, on remand, in addition to Mercer's

---

[20]*See, e.g.*, **Ettell**, 188 F.3d at 1145; **Rembert**, 141 F.3d at 282; **Hashemi**, 104 F.3d at 1125; **Eashai**, 87 F.3d at 1090. *Cf.* **Harte-Hanks Communications, Inc. v. Connaughton**, 491 U.S. 657, 668 (1989) ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence").

testimony that she intended to pay, *all* of the facts and circumstances surrounding her card-use may be considered in determining Mercer's *subjective* intent.

b.

Cases such as this one, involving card-use to finance gambling, with the claim of *intent to pay with gambling winnings*, present a particularly difficult challenge for determining whether the debtor, at card-use, *subjectively* intended to pay.[21] Obviously, gamblers gamble with the hope of winning, *not* losing. Mercer so testified. But, *hoping* to win is *not* synonymous with *intending* to pay. "A statement of intent (I will repay) is distinguishable from a hope or a desire to [do so. It] ... suggests a plan to repay [, and] ... an anticipated source of funds from which [it] might be

---

[21]*See, e.g.*, **Rembert**, 141 F.3d at 279, 282 (debtor "believed" and "thought" would win enough to pay card-debt; subjective intent to pay present where debtor took second mortgage on home, used proceeds to pay debt, and made substantial payments on it while continuing to gamble and lose); **Anastas**, 94 F.3d at 1287 (although unlikely debtor would win in order to pay cash advances that financed gambling, record supported good faith intent, where debt incurred over six-month period during which monthly payments made, issuer contacted to try to make alternative payment arrangements, and debtor testified always intended to pay, but gambling addiction led to unexpected financial circumstances); **Star Bank, N.A. v. Stearns (In re Stearns)**, 241 B.R. 611, 624 (Bankr. D. Minn. 1999) (debtor's persistent belief in salvation of "big win" was fatuous, but genuine); **Universal Card Servs. v. Pickett (In re Pickett)**, 234 B.R. 748, 757 (Bankr. W.D. Mo. 1999) (intent to pay *not* credible when debtor lost $100,000 in one year); **Boyd Gaming Corp. v. Hall (In re Hall)**, 228 B.R. 483, 490 (Bankr. M.D. Ga. 1998) (intent to pay where debtor honestly, though unreasonably, believed would get lucky and be able to pay debts, although had lost for over 15 years).

made." *Melancon*, 223 B.R. at 336. Accordingly, if a debtor presents evidence of alternative sources of expected-income sufficient to make her minimum payment, her intent with regard to her gambling winnings would be less relevant.

Therefore, in determining whether Mercer subjectively intended to pay card-loans obtained to finance gambling, one relevant inquiry is what Mercer intended to do with any winnings. Did she intend to use them to pay her card-debt, or to finance more gambling? *See id*. at 336-41 (suggesting court should inquire whether debtor has ever gambled and won, and what she did with winnings).

3.

The bankruptcy court did *not* consider intent to deceive. Of course, if the debtor does *not* know the representation is false, there is *no* misrepresentation; therefore, she does *not* intend to deceive. *See FCC Nat'l Bank/First Card v. Friend (In re Friend)*, 156 B.R. 257, 262 (Bankr. W.D. Mo. 1993). Nevertheless, the Restatement treats the elements separately. *See* RESTATEMENT (SECOND) OF TORTS § 526 cmt. b (§§ 526-530 state "rules that determine whether a representation is fraudulently made"; §§ 531-36, rules regarding "maker's purpose to induce the recipient to act in reliance upon the misrepresentation"); *see also Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 784 (10th Cir. B.A.P.

28

1998) (fraudulent nature of representation separate from intent to deceive to influence conduct).

Intent to deceive is present if the debtor "intends or has reason to expect [the creditor] to act or to refrain from action in reliance upon the misrepresentation". RESTATEMENT (SECOND) OF TORTS § 531. "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct." *Id*. § 531 cmt. c.

With card-use, and the concomitant representation of intent to pay, the cardholder's intent is for the creditor, in reliance on that representation, to approve the requested loan. *E.g.,* **Melancon**, 223 B.R. at 324-25.[22]  Accordingly, *if* the bankruptcy court finds that, by card-use, Mercer made a knowingly false representation of intent to pay, then the separate requisite *intent to deceive* is also present.

4.

UCS had the burden of proving not only that it *actually* relied on Mercer's representation, but also that its reliance was

---

[22]*See also, e.g.*, **Sears, Roebuck & Co. v. Homschek (In re Homschek**), 216 B.R. 748, 753 (Bankr. M.D. Pa. 1998) (card-use "for the sole purpose of obtaining" loan); **Feld**, 203 B.R. at 372 (by card-use, debtor intended to induce issuer to extend credit — "requisite intent to induce action").

29

*justifiable*. *See* RESTATEMENT (SECOND) OF TORTS § 537. The effect *vel non* of the card's being "pre-approved" comes into play here.

a.

In bankruptcy court, the parties did *not* devote much attention to *actual* reliance. It is treated extensively here, for the most part, in order to respond to Judge Dennis' dissent. The parties stipulated Mercer was familiar with card accounts and how obligations arise in connection with them; and she admitted that, through card-use, she incurred a debt to UCS. The trial's focus was primarily on the scienter element and on *justifiable* reliance. Perhaps for that reason, most of the testimony of UCS' bankruptcy specialist (UCS' witness) dealt with UCS' pre-card-issuance screening process and the information it had available to it before offering Mercer a pre-approved card. Concerning actual reliance, UCS' witness testified as follows:

> Q.   Based on [UCS'] records with regard to this information, would [UCS] *have extended credit* to [Mercer] *if it knew* that she would *not* pay or did *not* have ability to pay *for these charges* on this account?
>
> A.   I would say no.

(Emphasis added.)[23]

---

[23]Judge Dennis states that, *when read in context*, this quoted testimony did *not* refer to reliance on Mercer's card-use, but instead concerned the quality of information available to UCS at card-issuance. But, the *specific question at issue* specifically refers to "*extend[ing] credit*" and to "*for these charges*" (emphasis added), obviously *referring to card-use, not card-issuance*. The fact that much of the testimony preceding and subsequent to the

30

This lack of emphasis on actual reliance is shown by Mercer's closing argument instead being directed primarily at the representation and scienter elements. Contrary to her later appellate briefs' position, she argued: card-use was *not* a representation of intent to pay. As a result, she did *not* expressly argue that UCS failed to prove *actual reliance* on *card-use* representations. *Instead*, *she argued that, at card-issuance, UCS did not rely on any representations by her.*

In its bankruptcy court brief, UCS contended *actual reliance* was demonstrated by its extension of credit (loan) to Mercer at each card-use. Mercer's responsive brief took a different approach: UCS could *not* show actual and justifiable reliance when,

---

quoted testimony dealt with card-issuance simply reflects the focus of the parties — and the bankruptcy court — on justifiable, *not actual*, reliance.

As Judge Dennis points out, prior to the quoted testimony, UCS' witness testified regarding Mercer's other credit cards and the credit bureau screening process. Immediately after the quoted question and answer, counsel asked another question regarding UCS' card-issuance decision. And, the very next question concerned whether Mercer "had the intent and ability to repay *these charges when they were incurred*". (Emphasis added). Viewing UCS' witness' testimony as a whole, it seems clear that UCS' counsel was trying to present evidence to establish each of the elements of fraud, but focused primarily on the most heavily-disputed elements of scienter and justifiable reliance. The presentation of UCS' witness' testimony was somewhat disjointed, in part due to the bankruptcy court's intermittent questions regarding UCS' pre-issuance investigation.

In short, UCS' witness testified that UCS would "no[t]" "have extended credit" to Mercer "if it knew that she would *not* pay for [the] charges on [her] account". This is actual reliance.

31

*at or before card-issuance*, it had an opportunity to make an adequate investigation; passively extending credit *at card-issuance* did *not* constitute reliance on subsequent *card-use*.

Regarding actual reliance, the bankruptcy court held:

> [UCS] solely relied on its own agents and investigative processes to make its [card-issuance] decision. The evidence reflects nothing written, said or done by Mercer upon which [UCS] relied at any time [at card-use].

> The court concludes that without the establishment of reliance on [Mercer's] representations *at the time the card was issued*, reliance will *not* attach to the representations, if any, made by [Mercer] with the subsequent *use* of the card. Under the circumstances of this case, *where the credit card was pre-approved*, based solely on [UCS'] screening process, performed through various credit bureaus and the [risk] score, *there was no actual reliance* by [UCS] on representations made by [Mercer].

*Mercer*, 220 B.R. at 326-27 (emphasis added).

The finding of "nothing written, said or done by Mercer upon which [UCS] relied at" card-use, *id.*, was influenced by an erroneous interpretation of the law as requiring reliance on representations by the debtor, regarding her financial condition, *at card-issuance*, in order for the issuer to rely on subsequent representations *at card-use*.  Prior to the above-quoted passage, the bankruptcy court, 220 B.R. at 325-26, quoted at length from *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997), which held:  "[A] creditor

32

*cannot* justifiably rely on any representation, or the absence thereof, made by a card holder *if the card was pre-approved*, and *no* direct financial information was obtained by the issuer". ***Id***. at 338 (emphasis added).

The *actual* reliance inquiry must focus on the representations, *through card-use*, of intent to pay, even if, for card-issuance, the issuer relied on its investigation of the debtor's creditworthiness, rather than on any representations by her. Again, any such pre-issuance representations, *regarding her financial condition*, are *not* actionable under § 523(a)(2)(A), and *cannot* support actual reliance on subsequent card-use intent to pay representations. Because the bankruptcy court's factual finding of *no* actual reliance on card-use representations is based on an incorrect interpretation of the law, it is *not* insulated by the clearly erroneous standard of review. *See **Fabricators***, 926 F.2d at 1464.[24]

---

[24]Judge Dennis focuses, as did the bankruptcy and district courts, on UCS' reliance on its own screening and investigation in making the decision to issue the card to Mercer. Because the representations at issue are those of intent to pay each loan obtained through card-use, the fact that UCS did *not* rely on any representation by Mercer at card-issuance does *not* preclude it, as discussed *infra*, from relying on card-use representations. *See* RESTATEMENT (SECOND) OF TORTS § 546 (representation need *not* be sole, but only substantial, factor in influencing recipient's action). As discussed, because the bankruptcy and district courts applied an incorrect legal standard in finding *no* actual reliance, focusing on card-issuance rather than card-use, to find *no* actual reliance, the clearly erroneous standard is *not* applicable. Judge Dennis' suggestion that the error is harmless because UCS did *not* prove

The record does *not* contain briefs filed in district court. The district court held:  the bankruptcy court correctly applied the law in determining whether UCS actually and justifiably relied on "Mercer's representations, if any"; and the bankruptcy court did *not* clearly err in finding "the evidence reflects nothing written, said or done by Mercer upon which [UCS] relied at" card-use.

In its briefs before the panel, in addressing *actual reliance*, UCS contended:  the bankruptcy court applied the wrong standard and "erroneously concluded that ... UCS did *not* actually rely on Mercer's representations despite the *uncontested fact* ... it advanced the funds she requested [with] each" card-use; *actual reliance* was demonstrated by this credit extension; and her representation of intent to pay was a substantial factor in its making the requested loans. (Emphasis added.)  In its supplemental (en banc) brief, UCS reiterated these contentions in support of its credit extension proving *actual reliance* on Mercer's representations.

_____

actual reliance on Mercer's card-use representations is based on his view of UCS' witness' testimony as relating to the information UCS obtained through its pre-card-issuance investigation; as discussed *supra*, the question asked of the witness referred to "these charges", *not* to card-issuance. Moreover, the error was *not* harmless.  By focusing solely on UCS' card-issuance decision, and what the bankruptcy court found to be an inadequate pre-issuance investigation of Mercer's creditworthiness under a standard even more stringent than the now-rejected reasonable reliance standard, the bankruptcy court did *not* consider:  whether, with each card-use, Mercer made a representation of intent to pay; or whether UCS relied on that representation when approving charges or advancing cash to Mercer.

Mercer's panel brief did *not* respond directly; it asserted, conclusorily, that the *no*-actual-reliance finding should be affirmed.  In her supplemental brief, Mercer, *for the first time*, attempted to respond, maintaining, consistent with the bankruptcy court, that, because UCS did *not* actually rely on any representations *at card-issuance*, it was precluded from relying on any at subsequent *card-use*.

"The recipient of a fraudulent misrepresentation can recover ... only if he in fact relies upon the misrepresentation ... and his reliance is a *substantial factor* in bringing about [his] loss." RESTATEMENT (SECOND) OF TORTS § 537 cmt. a (emphasis added).  That comment refers to the Restatement's rule on *causation in fact*, which provides, similarly, that the reliance must be "a *substantial factor* in determining the course of conduct that results in his loss".  *Id*. § 546 (emphasis added).  Accordingly, actual reliance is the equivalent of causation-in-fact.[25]

The "standard of *actual reliance* requires *little* of the creditor", *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 284 (11th Cir. 1995) (emphasis added); it must prove it "in fact relied upon the representations of the debtor".  *Id*. at 281. Moreover, as mentioned, such reliance need *not* be the "but-for"

---

[25]*See, e.g.*, *Mayer v. Spanel Int'l Ltd. (Matter of Mayer)*, 51 F.3d 670, 676 (7th Cir.), *cert. denied*, 516 U.S. 1008 (1995); *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 701 (Bankr. S.D.N.Y. 1998); *Hernandez*, 208 B.R. at 876.

cause of the issuer's actions: "It is enough that the representation has *played a substantial part*, and so has been a substantial factor, in influencing his decision." RESTATEMENT (SECOND) OF TORTS § 546 cmt. b (emphasis added; citation omitted).

Courts that recognize card-use as an intent to pay representation generally have concluded that the issuer's extension of credit constitutes *actual reliance* on such representation.[26] Obviously, the debtor's promise to pay is an essential factor in the issuer's decision to make the requested loan; it would *not* do so without it. Likewise, the debtor's card-use (conduct) causes the issuer's loss when it reimburses the merchant and the debtor does *not* pay.[27]

---

[26]*See, e.g.*, **Melancon**, 223 B.R. at 327; **AT&T Universal Card Servs. Corp. v. Pakdaman**, 210 B.R. 886, 890 (D. Mass. 1997); *see also* **Ward**, 857 F.2d at 1087 (Merritt, J., dissenting) (issuer relied on good faith card-use because it paid debt created thereby with expectation of reimbursement by cardholder); **AT&T Universal Card Servs. Corp. v. Dietzel (In re Dietzel)**, 245 B.R. 747, 755 (Bankr. D. Mass. 2000) (because card-use represents intent to pay, cardholder induces action by issuer; thus, cardholder's false representation is substantial factor in issuer's decision to make loan); **Citicorp Credit Servs., Inc. v. Hinman (In re Hinman)**, 120 B.R. 1018, 1022 (Bankr. D.N.D. 1990) (card industry functions upon issuer's guarantee of payment to merchant; reliance by issuer inherent in system because card-use forces issuer to honor its guarantee to merchant).

[27]Judge Dennis' quotation of testimony dealing with scienter is *not* relevant to the analysis for *actual reliance*. Nevertheless, Judge Dennis relies on that testimony to assert "[i]t is highly improbable that [UCS] actually relied on these same card uses — which its expert testified were indicative of a fraudulent intent *not* to repay the charges incurred — in deciding to take the action of extending credit to Mercer". (Emphasis added.) Obviously, a finding of *no* actual reliance *cannot* be based on evidence that the

Some bankruptcy courts have held an issuer's "passive" extension of credit does *not* constitute reliance on card-use, that it "*cannot* sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation". *Alvi*, 191 B.R. at 731 (emphasis added).[28] Another line of cases holds that the issuer relies only on the cardholder's card-agreement promise to pay, and *not* on any representations emanating from subsequent card-use. *See GM Card v. Cox (In re Cox)*, 182 B.R. 626, 636 (Bankr. D. Mass. 1995) (because card-agreement includes promise to pay, "it would be irrational for a fact finder to conclude [the issuer] relied upon a later [card-use] implied representation of intent to pay").[29] We disagree with both lines of cases.

---

creditor, in hindsight, determines is indicative of the debtor's fraudulent intent.

[28]*See also Hernandez*, 208 B.R. at 877; *Bank One Columbus, N.A. v. McDaniel (In re McDaniel*), 202 B.R. 74, 78 (Bankr. N.D. Tex. 1996); *Christensen*, 193 B.R. at 867; *cf*. *Bank of America v. Jarczyk (In re Jarczyk)*, 253 B.R. 140, 149 (Bankr. W.D.N.Y. 2000) (if card issued without relying on debtor's representation of intent to pay, may *not* claim reliance on card-use representations); *Briese*, 196 B.R. at 454 (issuer relied on own investigation; debtors' representations largely irrelevant); *Pan American Bank, N.A. v. Lilienfeld (In re Lilienfeld)*, 36 B.R. 724, 726-27 (Bankr. S.D. Fla. 1984) (issuer relies on debtor's representations at card-issuance and need *not* prove specific reliance at each card-use).

[29]*See also Rich*, 249 B.R. at 719; *Universal Bank, N.A. v. Kuntz (In re Kuntz)*, 249 B.R. 699, 707 (Bankr. N.D. Tex. 2000); *Hernandez*, 208 B.R. at 878.

First, **Alvi** and its progeny also hold card-use is *not* a representation. We have rejected that proposition.

Second, for actual reliance, the representation at issue is the intent to pay the loan obtained through card-use. The fact that an issuer based its card-issuance decision on its investigation of the debtor's creditworthiness does *not* preclude the issuer from relying also on the debtor's subsequent card-use intent to pay representation. Similarly, consistent with the earlier-quoted Restatement (Second) of Torts § 546 comment b, reliance on the debtor's card-agreement promise does *not* preclude relying also on the card-use representation. Moreover, reliance on the card-agreement alone would be insufficient; again, there is *no* loan to pay *until* card-use.[30] *See* **Melancon**, 223 B.R. at 327 n.37; *see also* **Manufacturer's Hanover Trust Co. v. Ward (In re Ward)**, 857 F.2d 1082, 1088-89 (6th Cir. 1988) (Merritt, J., dissenting) (without issuer's reliance on promise to pay through card-use,

---

[30]Judge Dennis states that, because each cash advance Mercer obtained was made instantaneously from an ATM machine, no one at UCS evaluated the transaction or relied on any representation Mercer made through card-use. Relying on the evidence of the time lag between transactions (when the loan/cash advance was made/received) and posting the charges, Judge Dennis concludes that, because UCS was *not* aware of the transactions until several days after they occurred, UCS could *not* have relied contemporaneously upon each individual draw on Mercer's credit line. As discussed, this analysis completely overlooks the *fundamental fact* that a *cash advance is a loan, not a gift. Inherent in any loan is a promise to pay. See* **Melancon**, 223 B.R. at 326 ("promise to repay is not merely a substantial factor in determining whether a loan will be made[;] [i]t is an essential element of any loan").

consideration is lacking, and contract is voidable; the opposite "*result would undermine credit cards as a medium of exchange*" (emphasis added)).[31]

In sum, an issuer usually will be able to establish *actual* reliance by showing it would *not* have approved the loan in the absence of debtor's promise to pay (through card-use).  It is

---

[31]Along this line, in some circumstances the claimed reliance on a representation of intent to pay may be *so unreasonable* that it could support finding *no actual reliance.*  "[T]he greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact".  **Field**, 516 U.S. at 76; *see also* **Vann**, 67 F.3d at 281 ("Reasonableness of the reliance may be used as proof that the creditor did rely."); *cf.* **First Deposit Nat'l Bank v. Mack (In re Mack)**, 216 B.R. 981, 983, 985 (Bankr. N.D. Fla. 1997) (*without conducting any credit check*, issuer sent debtor solicitation, requesting only her social security number, home telephone number, and annual household income; card provided debtor along *with cash advance check for $3,000*); **AT&T Universal Card Servs. v. Crutcher (In re Crutcher)**, 215 B.R. 696, 698 (Bankr. W.D. Tenn. 1997) (after debtor advised issuer she was considering bankruptcy and was an addicted gambler, and requested her account be closed and *not reopened under any circumstances*, issuer approved emergency cash advance so debtor could pay $2,500 casino debt and permitted cash advances, increasing account balance to over $11,000 during 24-hour gambling spree); **First USA Bank v. Hunter (In re Hunter)**, 210 B.R. 212, 213–14 (Bankr. M.D. Fla. 1997) (after debtor defaulted on card and filed bankruptcy, same creditor offered debtor another pre-approved card one week before trial on creditor's nondischargeability complaint); **Feld**, 203 B.R. at 370 (if issuer distributes cards freely *without conducting any credit analysis*, appropriate to find *no* reliance).

Concerning **Field**'s statement that "reasonableness goes to the probability of actual reliance", 516 U.S. at 76, it would seem that any situation in which claimed actual reliance is so unreasonable as to support finding *no* reliance-in-fact would also support finding reliance was *not* justifiable, as discussed *infra*.  We need *not* reach that issue here.

undisputed that, for each Mercer card-use, UCS authorized the requested loan. Obviously, her intent to pay representation, through card-use, was a *substantial factor* in UCS' decision to make each loan. Equally obvious, if she had *not* used the card, UCS would *not* have made a loan; nothing would have occurred.[32] As a

---

[32]Judge Dennis states: "After Mercer accepted the credit card and began using it, [UCS] did not take any action to extend her line of credit in contemporaneous reliance on each draw". But, obviously, by making the *loan (cash advance) requested with each card-use*, UCS took action in reliance on Mercer's promise to repay that loan.

The transactions took place within the context of the cardmember agreement and line of credit.

> On a purely physical level, the course of action that causes the issuer's loss is the pushing of buttons, combined with the internal actions of the ATM. But these physical actions must be understood within the context of the contractual arrangement that makes them meaningful. Pushing random buttons or putting the wrong card in the machine won't generate any money. It is only through prior arrangements (the assignment of a card to the holder, the choice of a PIN, the operation of the network, the provision of ATMs in convenient locations) that the transaction works at all, and *part of this prior arrangement is the understanding that the physical act of pushing the buttons will carry with it some unverbalized statements that have legal significance*.

*Melancon*, 223 B.R. at 326 (emphasis added).

When Mercer received the requested cash advances, she immediately received cash in hand. The fact that the transactions (cash advances) were *not* posted simultaneously does *not* change the fact that they were *loans* which would *not* have been made in the absence of a promise to repay them. Judge Dennis' position would require card issuers to monitor individual transactions as they

40

matter of law, UCS actually relied on Mercer's card-use representations.

b.

Concerning *justifiable reliance*, the Restatement has a special rule for representations of *intention*, as at issue here. Reliance is *justifiable* "if the *existence* of the intention is *material* and the recipient has *reason to believe* that it will be carried out". ***Id***. § 544 (emphasis added).

(1)

For the *existence* of the *intention*, the recipient is justified in relying on a representation only if it gives him "reason to believe that the intention is firmly entertained and, therefore, to expect that it will be carried out. Whether the recipient has reason for this belief depends upon the circumstances under which the statement was made, including the fact that it was made for the purpose of inducing the recipient to act in reliance upon it and the form and manner in which it was expressed". ***Id***. § 544 cmt. a.

For the existence of the intention being *material*, ***id***. § 544 cmt. b; *see also **id***. § 538(1), § 544's commentary contains a cross-reference to § 538(2), which defines materiality. It is present when, in deciding on a course of action, "a *reasonable* man would

---

occur, and would result in great delay in receiving credit (especially troublesome for cash advances), increased credit costs for non-bankrupt card users, and would, in short, greatly undermine — if *not* destroy — the use of cards as a medium of exchange.

41

*attach importance* to its existence" or "the maker of the representation knows *or has reason to know* ... its recipient regards or is likely to regard the matter as important ..., *although a reasonable man would not so regard it*". **Id.** § 538(2) (emphasis added).[33]

As a matter of law, the materiality element is present here: in determining whether to approve the loan requested by card-use, a *reasonable* issuer would *attach importance* to the existence of a cardholder's *representation of intent* (promise) to pay that loan. *See* **Melancon**, 223 B.R. at 327 ("[i]f the representation is a necessary part of the transaction, ... it is material").

(2)

The second prong for justifiable reliance on a statement of *intention* is *reason to believe* the intention will be carried out. If the recipient "*knows facts* that will make it *impossible* for the maker to [carry out his intention, the recipient] *cannot be justified* in his reliance". RESTATEMENT (SECOND) OF TORTS § 544 cmt. c (emphasis added).

---

[33]*Cf.* **Mayer**, 51 F.3d at 676 ("[A]n investor *cannot* close his eyes to a *known risk*. If the investor possesses information sufficient to call the representation into question, he *cannot* claim later that he relied on or was deceived by the lie. This is *not* because he has a duty to investigate lies or prevent intentional torts, though; it is, rather, because the false statement is *not material* under the circumstances." (emphasis added)).

42

The comment's use of "knows", and *its omission of "should have known"*, suggest strongly that, for *justifiable reliance* on a *representation of intention*, the recipient is *not* required to conduct an investigation. Section 540 confirms this: "The recipient of a fraudulent *misrepresentation of fact* is justified in relying upon its truth, although he *might* have ascertained [its] falsity ... *had he made an investigation*." **Id**. § 540 (emphasis added).

This rule applies even when the investigation "could be made *without any considerable trouble or expense....* On the other hand, if a *mere cursory glance would have disclosed the [representation's] falsity ...,* its falsity is regarded as obvious ...." **Id**. § 540 cmt. a (emphasis added). In this regard, "[t]he recipient of a fraudulent misrepresentation is *not* justified in relying upon its truth if he *knows* that it is false or its falsity is *obvious* to him". **Id**. § 541 (emphasis added).

*Field*, which involved *a misrepresentation of fact*, relied on § 540 (*no* duty to investigate) in concluding that, for § 523(a)(2)(A) "actual fraud", the standard is *justifiable*, *not reasonable*, reliance. **Field**, 516 U.S. at 70. But, § 540 speaks only about fraudulent *misrepresentations of fact*. The case at hand involves a *representation of intention*, prompting whether § 540 applies.

43

The answer is found in the commentary to § 525. As mentioned, § 525 provides the general rule of liability for fraudulent misrepresentations of *fact, opinion, intention*, or *law*.

> Strictly speaking, "fact" includes not only the existence of a tangible thing or the happening of a particular event or the relationship between particular persons or things, *but also the state of mind, such as the entertaining of an intention or the holding of an opinion....* There is sometimes, however, a marked difference between what constitutes justifiable reliance upon statements of the *maker's opinion* and what constitutes justifiable reliance upon other representations. *Therefore, it is convenient to distinguish between misrepresentations of opinion and misrepresentations of all other facts, including intention.*

RESTATEMENT (SECOND) OF TORTS § 525 cmt. d (emphasis added); *see also Manufacturers Hanover Trust Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr. E.D.N.Y. 1983) ("A person's *intent*, his state of mind, ... is capable of ascertainment and a statement *of present intention* is deemed a statement of a *material existing fact*, sufficient to support a fraud action." (emphasis added; internal quotation marks and citation omitted)).

Therefore, for *justifiable reliance*, one form of a representation *of fact* is one *of intention*. *See Kukuk*, 225 B.R. at 784 (comments to § 525 provide representations of fact *include* those of intention). Accordingly, § 540's *no*-duty-to-investigate rule applies. Concomitantly, *Field*, even though it dealt with a

*representation of fact rather than of intention*, is controlling with respect to whether an issuer has a duty to investigate.

In addition to its citing §§ 540 and 541, dealing with *no* duty to investigate and obviousness of the representation's falsity, *Field* also cited the Restatement for "contributory negligence [*not* being a] bar to recovery because *fraudulent misrepresentation* is an *intentional tort*". *Field*, 516 U.S. at 70 (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 545A. *Field* contrasted *justifiable and reasonable reliance*:

> Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does *not* mean that his conduct must conform to the standard of the *reasonable man*. Justification is a matter of the qualities and characteristics *of the particular plaintiff*, and the *circumstances* of the particular case, rather than of the application of a *community standard* of conduct to all cases.

516 U.S. at 70-71 (quoting RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (emphasis added)).

In addition to the Restatement, *Field* cited other treatises to support the applicable standard being justifiable, *not reasonable*, reliance. *Id*. at 71-72. They state similarly that the recipient of a fraudulent misrepresentation may justifiably rely on it *unless* its falsity is obvious or there are "*red flags*" indicating such reliance is unwarranted. *See id*. ("[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered

45

something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own" (quoting W. PROSSER, LAW OF TORTS § 108, p. 718 (4th ed. 1971))); *id.* at 72 (recipient "is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can *not* offer as a defense the plaintiff's failure to make the investigation or examination to verify the same" (quoting 1 F. HARPER & F. JAMES, LAW OF TORTS § 7.12, pp. 581–83 (1956)) (emphasis added)); *see also* ***Mayer v. Spanel Int'l Ltd. (Matter of Mayer)***, 51 F.3d 670, 675 (7th Cir.) ("The common law of fraud ... does *not* have any reasonable-investigation requirement." (emphasis added)), *cert. denied*, 516 U.S. 1008 (1995).

(3)

Despite ***Field***'s guidance, reliance has been found *unjustifiable* by some courts if they conclude that, prior to card-issuance, the issuer's creditworthiness investigation was inadequate.[34] For example, the above-quoted holding in

---

[34]*See, e.g.*, ***Universal Card Servs. Corp. v. Akins (In re Akins)***, 235 B.R. 866, 872-74 (Bankr. W.D. Tex. 1999) (applying "commercial entrapment" theory, card-debt dischargeable because credit extension was result of issuer's negligent lending practices and industry's negligent use of faulty risk score system); ***Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store)***, 221 B.R. 265, 274 (Bankr. N.D. Okla. 1998) ("unlikely that ... issuer will be able to prove justifiable reliance if it did nothing to protect itself from irresponsible credit card use other than reviewing

***Ellingsworth***, relied on by the bankruptcy court in the case at hand, was that the issuer *cannot justifiably* rely on a card-use representation "if the card was *pre-approved*, and *no direct financial information was obtained by the issuer*". 212 B.R. at 338 (emphasis added). The court was critical of card-issuance based on the debtor's risk score, income, and employment, *without the issuer's also considering* her assets, secured debt, and other living expenses. *Id*. at 339. ***Ellingsworth***'s reasoning resembles the "assumption of risk" doctrine applied in ***Ward***, 857 F.2d at 1085, a pre-***Field*** case, which held: unless the issuer conducts a pre-issuance credit check, it *assumes the risk* that the debtor will *not* pay card-use loans.[35]

A different kind of "assumption of risk" doctrine was adopted by the Eleventh Circuit in ***First National Bank of Mobile v. Roddenberry***, 701 F.2d 927, 932-33 (11th Cir. 1983), decided under § 523(a)(2)(A)'s *predecessor*. A few years after applying for, and receiving, cards from a bank, the cardholder engaged in "a credit card spending spree". ***Id***. at 928. Although the bank advised

---

third-party credit reports which [are] ... so superficial in scope as to make them unreliable predictors of solvency, income, budget, work history, and other data relevant to the creditworthiness of a customer"); ***McDaniel***, 202 B.R. at 78 ("creditor *cannot* sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation" (emphasis added)).

[35]*See also **Etto***, 210 B.R. at 739; ***Carpenter***, 53 B.R. at 728-29.

merchants calling for authorization of charges to retrieve the card, she was able to use it without detection, by making small purchases, and continued doing so, even after filing bankruptcy. *Id*. at 928-29.

*Roddenberry* (pre-§ 523(a)(2)(A)) held: the issuer *assumes the risk* of nonpayment until it unconditionally revokes the right to card possession and use, and the cardholder is aware of the revocation. *Id*. at 932.[36] This theory has received considerable criticism.[37] Moreover, many bankruptcy courts in the very circuit that rendered the opinion have interpreted it as *not* precluding nondischargeability for "actual fraud" (added by the 1978

---

[36]*See also* **FCC Nat'l Bank v. Gilmore (In re Gilmore)**, 221 B.R. 864, 873 n.10 (Bankr. N.D. Ala. 1998) (suggesting *Roddenberry assumption of risk doctrine* "simply a variation of the common law principles of consent and estoppel, which may preclude a recovery for fraud", irrespective of justifiable reliance); **Dominion Bankshares Servs. v. Shrader (In re Shrader)**, 55 B.R. 608, 612 (Bankr. W.D. Va. 1985) (*Roddenberry* sound because burden properly placed on issuer to effectively monitor accounts); *cf*. **First Nat'l Bank of Atlanta v. Robinson (Matter of Robinson)**, 55 B.R. 839, 847-48 (Bankr. S.D. Ind. 1985) (issuer assumed risk of nonpayment *to extent of charges up to credit limit* when mailed unsolicited, pre-approved application without inquiring as to financial condition or ability to pay).

[37]*See, e.g.*, **Ford**, 186 B.R. at 318 n.8 ("many courts have criticized [**Roddenberry**'s] approach as going to an extreme, tipping the scales so far in favor of debtors that very few credit card debts will qualify as nondischargeable"); **Cox**, 182 B.R. at 634 (theory "too judgmental to support a court decision purporting to apply a statute"); **Sears Roebuck & Co. v. Faulk (In re Faulk)**, 69 B.R. 743, 755-56 (Bankr. N.D. Ind. 1986) (**Roddenberry** automatic revocation rule rejected "as contrary to the clear language of § 523(a)(2)(A)").

amendment), which most of those courts define as occurring through card-use without intent to pay.[38]

For several reasons, we reject both the **Roddenberry** and **Ward** variations of "assumption of risk". (Interestingly, Mercer did *not* rely on it. In fact, at closing argument, her counsel stated he was *not* urging its adoption: "in all fairness it goes a little bit too far".)

First, **Roddenberry** would make it virtually impossible for any issuer to prevail under § 523(a)(2)(A). The Bankruptcy Code should *not* be interpreted to require issuers to *assume the risk* that cardholders will commit fraud.[39] "Rather, the credit card transaction (like any other lending relationship) is premised upon the notion that both parties will act in good faith. Thus, the debtor is expected to make 'bona fide' use of the card and *not*

---

[38]*See, e.g.*, **AT&T Universal Card Servs. Corp. v. Reach (In re Reach)**, 225 B.R. 236, 239 (Bankr. N.D. Ala. 1997); **Hunter**, 210 B.R. at 215; **American Express Travel Related Servs. Co., Inc. v. Johnson (Matter of Johnson)**, 141 B.R. 473, 478 (Bankr. M.D. Ga. 1992).

[39]*See, e.g.*, **Feld**, 203 B.R. at 366 n.6 (fact that creditors anticipate loss does *not* mean "they should be saddled with losses resulting from fraud"); **Briese**, 196 B.R. at 449 (creditor does *not* assume risk debtor is dishonest); **J.C. Penney Co., Inc. v. Shanahan (In re Shanahan)**, 151 B.R. 44, 47 (Bankr. W.D.N.Y 1993) (issuer "perhaps assumes the risk of the user's ignorance, mistake, naivete, gullibility, misfortune, accident, or other innocent failing or adversity, but [*not* of] user's knowing and intentional use of the card to obtain goods without any realistic prospect of having the wherewithal to pay").

engage in fraud." ***Chevy Chase Bank, FSB v. Briese (In re Briese)***,

196 B.R. 440, 449 (Bankr. W.D. Wis. 1996) (emphasis added).[40]

Second, because the *assumption of risk theory* does *not*

consider the debtor's *intent* in incurring card-debt, it is likely

to result in the discharge of debt fraudulently-incurred, contrary

to the language and purpose of § 523(a)(2)(A).[41]  *See* ***Grogan***, 498

U.S. at 286-87 (Bankruptcy Code's "fresh start" policy for benefit

of "honest but unfortunate" debtors, *not* perpetrators of fraud);

*cf*. ***Sovran Bank, N.A. v. Allen (In re Allen)***, 65 B.R. 752, 765 n.20

(E.D. Va. 1986) ("Judicial attempts to engraft a fresh start policy

onto [§ 523(a)(2)(B), regarding false financial statements] ... are

---

[40]*See also* ***Sanford Inst. for Sav. v. Gallo***, 156 F.3d 71, 75 (1st Cir. 1998) (rule that "party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation ... is at the heart of millions of commercial transactions conducted daily in this nation which rely on the honesty and truthfulness of representation made by the parties" (citations omitted)).

[41]*See* ***Searle***, 223 B.R. at 389 ("'assumption of risk' theory advantages the dishonest and deceptive debtor"); ***Briese***, 196 B.R. at 449 ("[w]hile the bankruptcy code is to be construed liberally in favor of the debtor, it is also to be fair to creditors"; assumption of risk theory is "unsatisfactory, primarily because dishonest debtors may manipulate its mechanical distinction between debts incurred before and after credit privileges are revoked"); ***Hecht's v. Valdes (In re Valdes)***, 188 B.R. 533, 536-37 (Bankr. D. Md. 1995) (theory allows discharge regardless of debtor's intent, leaving issuer with little or *no* recourse even in most egregious situations; focus should be *not* on issuer's improvidence, but "on a fundamental tenet of bankruptcy — the discharge and fresh start are intended for the honest, but unfortunate debtor"); ***Dougherty***, 84 B.R. at 657 (theory "improperly focuses on the conduct of the 'improvident creditor' rather than on the conduct of the deceitful debtor who may be trying to misuse the Bankruptcy Code").

properly viewed with skepticism.  Because the policies underlying

questions of dischargeability are sharply conflicting, decisions

about the scope of the nondischargeability provisions are best left

to Congress where legislative techniques and the safeguard of

political accountability can ensure that the conflicting policies

are resolved in a legitimate manner.")[42]

Moreover, such *assumption of risk* could have the unintended

consequence of encouraging dishonest debtors, especially those with

pre-approved cards, to undertake spending sprees, until they have

reached their credit limits, knowing their debts will be

discharged, as long as they wait at least 60 days before filing.

*See* 11 U.S.C. § 523(a)(2)(C) (Supp. 2000)  (consumer debt for

luxury goods or services, or cash advances aggregating more than

$1,000, within 60 days before filing presumptively

nondischargeable)[43]  Obviously, a dishonest but patient debtor who

---

[42]*See also, e.g.*, **Mayer**, 51 F.3d at 674 ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment."); **American Express Travel Related Servs. Co., Inc. v. Diaz (In re Diaz)**, 185 B.R. 867, 870 (Bankr. M.D. Fla. 1994) ("By creating the fraud exceptions to discharge, Congress sought to discourage fraudulent conduct and ensure that relief intended for honest debtors does *not* inure to the benefit of dishonest ones." (emphasis added)).

[43]Accordingly, we disagree with the bankruptcy court's holding in **Cox**, 182 B.R. at 635-36, that § 523(a)(2)(C) is the "exclusive remedy" against "loading up" (incurring card debt in contemplation of bankruptcy); *see also* **AT&T Universal Bank v. Hensley (In re Hensley)**, 201 B.R. 494, 498 (Bankr. S.D. Ohio 1996).  That portion of **Cox** was disapproved by the district court in **Pakdaman**, 210 B.R. at 889-90.

intends to incur card-debt in contemplation of discharge easily could avoid this 60-day period. *See* **AT&T Universal Card Servs. Corp. v. Pakdaman**, 210 B.R. 886, 889-90 (D. Mass. 1997). Likewise, adoption of this theory undoubtedly would result in increased credit costs for honest card-users. *See* **Citibank (S.D.), N.A. v. Senty (In re Senty)**, 42 B.R. 456, 461 (Bankr. S.D.N.Y. 1984).

Finally, this *assumption of risk* theory is inconsistent with the common law, as expressed in the Restatement. Simply put, it confuses "assumption of risk" with "contributory negligence", as those doctrines are commonly understood. *Compare* RESTATEMENT (SECOND) OF TORTS § 463 (contributory negligence) *with* **id**. § 496A cmt. c (assumption of risk). Fraud being an intentional tort, a victim's contributory negligence is *not* a defense.[44] *See* RESTATEMENT (SECOND) OF TORTS § 545A & cmt. a. On the other hand, as discussed, the recipient of a fraudulent misrepresentation can be said, in a sense, to have *assumed the risk* of relying on the representation *only* when he *knows* it is *false* or it is *obvious* that reliance is *unjustified*. Accordingly, if an issuer does *not know* the falsity

---

[44]*See also, e.g.*, **Gallo**, 156 F.3d at 74 ("equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation"); **Mayer**, 51 F.3d at 675 ("[I]t is precisely because fraud has a mental-state requirement that it lacks a reasonable-investigation requirement.... Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it, and the common law has tailored the doctrine accordingly.").

of the user's representation of intent to pay, or if it is *not* obvious that reliance on the representation is unjustified, the issuer does *not* assume the risk the cardholder will commit fraud.

(4)

The Ninth Circuit's justifiable reliance standard for card-dischargeability is consistent with **Field** and the Restatement: the "issuer *justifiably relies* on a representation of intent to pay as long as the account is *not* in default and any initial investigations into a credit report *do not raise red flags* that would make reliance unjustifiable". **Anastas**, 94 F.3d at 1286 (emphasis added); *see* **Eashai**, 87 F.3d at 1090-91 ("although a person ordinarily has *no* duty to investigate the truth of a representation, a person *cannot* purport to rely on *preposterous representations* or *close his eyes* to avoid discovery of the truth" (emphasis added)); **Hashemi**, 104 F.3d at 1126.[45] This standard appropriately "recognizes the unique nature of credit card

_____

[45]*See also, e.g.*, **Dietzel**, 245 B.R. at 754 (applying **Anastas** standard); **AT&T v. Herrig (In re Herrig)**, 217 B.R. 891, 899-900 (Bankr. N.D. Okla. 1998) (same); **MBNA America v. Simos (In re Simos)**, 209 B.R. 188, 193 (Bankr. M.D.N.C. 1997) (same); **Feld**, 203 B.R. at 370 ("In rejecting those cases that impose a duty to investigate in the absence of anything that would arouse suspicion, the Supreme Court *implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags*. Thus, following an initial credit check that uncovers *no* problems, if a cardholder's use is consistent with past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable." (emphasis added)).

transactions, the ability of a cardholder to mask an actual financial condition by making minimum payments from whatever sources, and the ... issuer's lack of access to the cardholder's present financial condition" at each card-use. *AT&T Universal Card Servs. Corp. v. Searle*, 223 B.R. 384, 391 (D. Mass. 1998) (for card-debt, adopting Ninth Circuit's justifiable reliance standard).

Of course, if the issuer discovers "red flags" during a pre-issuance investigation or during the lending relationship, such as unemployment or insufficient income to service existing debt, it probably would *not* be justified in relying on a representation of intent to pay. *See Briese*, 196 B.R. at 454 (*reliance unjustified* where issuer's investigation revealed "high debt load and an inability to make more than minimum payments"; issuer thus "ignored an obvious risk in extending credit").[46]

Although the bankruptcy court cited *Field* and stated the applicable justifiable reliance standard, *Mercer*, 220 B.R. at 323, it did *not* apply it. Instead, it held: even assuming UCS *actually relied* on any representations by Mercer, it was *not justifiable* "in

_____

[46]*See also, e.g.*, *Mercantile Bank v. Canovas*, 237 B.R. 423, 429-30 (Bankr. N.D. Ill. 1998) (issuer did *not* justifiably rely on representations of intent to pay made after it terminated debtor's charging privileges and then invited him to incur more charges; *falsity of misrepresentation was obvious upon cursory examination*); *AT&T Universal Card Servs., Inc. v. Nguyen (In re Nguyen)*, 235 B.R. 76, 90-91 (Bankr. N.D. Cal. 1999) (reliance *unjustifiable* where card issued with $8,000 limit, knowing debtor would have $32,400 in available credit on his four cards, even though his monthly income was only $640).

54

light of the incomplete nature of the credit information obtained by [UCS]". *Id*. at 327. It suggested: "If [UCS] does *not* want its cardholders to use cash advances for gambling purposes and wants such uses to be non-dischargeable, why not put a specific restriction on this use in the cardholder agreement". *Id*. at 328 (emphasis added).

At trial, the bankruptcy judge had suggested a number of questions UCS should have asked Mercer before card-issuance, such as whether she: was married; had other credit cards or loans; and had a gambling addiction. It had also asked why UCS did *not* prohibit card-use at ATM machines in casinos. At the trial's conclusion, the court had suggested that, in addition to relying on credit bureau information and risk scores, issuers could ask, among other things, whether the debtor: has any problem with gambling; owes any gambling debts; and has had any gambling losses or winnings over the past several years. It had also suggested issuers should be required to exercise due diligence. Needless to say, the applicable *justifiable reliance standard* does *not* require such due diligence. In fact, the suggested standard was much more stringent than the *reasonable reliance standard* applied in many cases *prior* to being rejected by **Field**.[47]

---

[47]*See* **BancBoston Mortgage Corp. v. Ledford (In re Ledford)**, 127 B.R. 175, 178 (M.D. Tenn. 1991) ("critical issue is whether reliance on the representations was reasonable, *not* whether the decision to loan money was reasonable" (emphasis added)), *aff'd*, 970 F.2d 1556 (6th Cir. 1992), *cert. denied*, 507 U.S. 916 (1993);

Even assuming UCS, a sophisticated lender with considerable resources, could have conducted the type investigation envisioned by the bankruptcy court, its failure to do so does *not per se* preclude finding it was justified in relying on Mercer's card-use representations of intent to pay, because the information it obtained prior to card-issuance *appears*, based on the earlier-discussed evidence, *not* to have raised "red flags" requiring further investigation. Of course, justifiable reliance is a question of fact. *See* **Coston v. Bank of Malvern (Matter of Coston)**, 991 F.2d 257, 260 (5th Cir. 1993) (en banc) (pre-**Field**; reasonable reliance question of fact). Because the bankruptcy court applied an incorrect legal standard in finding *no* justifiable reliance, on remand it must make that determination, under the correct legal standard.

For justifiable reliance, the focus should be on whether UCS, based on its credit screening and its relationship with Mercer during her brief card-use, had reason to believe she would *not* carry out her representation, through card-use, of intent to pay. Relevant to that determination are the circumstances under which the representation was made, including the fact that it was made for the purpose of inducing UCS to act in reliance upon it, and the

*Faulk*, 69 B.R. at 749 (more stringent *reasonable* reliance standard does *not* authorize court to "second guess a creditor's decisions to make a loan or set loan policy for a creditor" or "to undertake a subjective evaluation and judgment of a creditor's lending policies and practices" (internal quotation marks and citations omitted)).

form and manner in which it was expressed.  *See* RESTATEMENT (SECOND) OF TORTS § 544 cmt. a.  And, facts pertinent to that inquiry include, but are *not* limited to:  (1) UCS' decision to offer the pre-approved card, based on an examination of Mercer's credit history — twice *before* acceptance, and again *between* acceptance and issuance; (2) the terms of the card-agreement, which provided that Mercer's card-use signified her acceptance of those terms, including the requirement that she pay the loans incurred, by making at least the minimum monthly payments; and (3) Mercer's reaching her limit within the first billing cycle, within the scope of the card-agreement, *and before* UCS had any reason to suspect she would *not* pay.

(5)

Some courts have criticized issuers for allowing card-use at casinos, and have held issuers *cannot* justifiably rely on representations of intent to pay through card-use at a casino to obtain cash advances.[48]  Along that line, Mercer contends that,

---

[48]*See, e.g.*, **Melancon**, 223 B.R. at 329 & nn. 42, 43 (noting "obvious stupidity of ... decision to lend money in a casino to borrowers who gamble"; "[i]f a lender allows a holder to borrow money inside a casino, then the lender must be charged with two bits of information:  the money will be used for gambling, and either the borrower has been losing or he has *no* money of his own with which to gamble"; "[a] creditor that lends money inside a casino is *not* justifiably relying on anything" (emphasis added)); **AT&T Universal Card Servs. Corp. v. Reynolds (In re Reynolds)**, 221 B.R. 828, 840 (Bankr. N.D. Ala. 1998) ("issuers which allow cash advances on ATMs in gambling casinos are on notice their customers may use the money to gamble, and presumably that some gamblers may be poor credit risks").

because she so used her card, UCS failed to prove justifiable reliance.

Although there may be circumstances in which a debtor's obtaining cash advances in a casino may have relevance in determining justifiable reliance, *see, e.g.*, **AT&T Universal Card Servs. v. Crutcher (In re Crutcher)**, 215 B.R. 696, 698 (Bankr. W.D. Tenn. 1997), the record at hand does *not* contain evidence of such circumstances. It does *not* support Mercer's assertion UCS was aware, *when she inserted her card into the ATM*, she was in a casino. Instead, the billing statement reflects that, although Mercer obtained four advances at a casino on 23 and 24 November, they were *not* posted until 27 November. As UCS' representative testified, that posting-date is when UCS receives an electronic transfer notification from the clearing bank, which may be several days after the transaction.

Moreover, as a matter of law, there is *no* basis for treating cash advances obtained at casinos differently from those obtained elsewhere. Section 523(a)(2)(A) does *not* do so. In any event, although Mercer testified she used her UCS cash advances for gambling, she obtained more than twice as many of them *at a bank as in a casino.* And, the evidence established UCS has *no* control over ATM locations and is *not* affiliated with the entity which operated the casino ATM from which Mercer obtained the advances.

The record contains *no* evidence to support precluding issuers from justifiably relying on a cardholder's promise to pay a cash advance *merely because* it was obtained at a casino. Common sense suggests that *not* everyone does so to obtain gambling funds, much less that she does so because she is losing and has *no* other source for those funds. For example, if given a choice, some might consider it safer, or more convenient, to enter a casino to obtain cash, rather than do so at an ATM outside a bank, where there is *no* security and far greater potential for being robbed. Or, some might be in a casino hotel for a convention or musical entertainment and obtain a cash advance at an ATM there for non-gambling uses.

(6)

The fact that Mercer reached her limit within the first billing cycle, before receiving her first statement, also does *not* detract from finding justifiable reliance. Obviously, if a cardholder has a history of payments with the issuer, justifiable reliance will be easier to prove.[49] But, the absence of that

---

[49]*See, e.g.*, **Hashemi**, 104 F.3d at 1126 (justifiable reliance where account *not* in default and debtor had history of paying large balances); **AT&T Universal Card Servs. v. Fronning (Matter of Fronning)**, 222 B.R. 614, 618 (Bankr. D. Neb. 1998) (justifiable reliance where cards had been outstanding for over a year when disputed charges made, charges were within limit, and *no* evidence to suggest issuer on notice of debtor's deteriorating financial condition before charges made); **Samani**, 192 B.R. at 880 (justifiable reliance "based on debtors' prior sporadic payment of at least the minimum monthly amount due"); *cf*. **AT&T Universal Card Servs. v. Burdge (In re Burdge)**, 198 B.R. 773, 778 (9th Cir. B.A.P.

59

history does *not* preclude such reliance.[50]  Because Mercer reached her limit so quickly, UCS had *no* opportunity to evaluate her creditworthiness based on a history with it.  Until 11 December (only a month after issuance), the last day of card-use, when she exceeded her $3,000 credit limit by approximately $186, Mercer's card-use was within the terms of the card-agreement.

Requiring that a cardholder have a history of timely payments *before* the issuer can justifiably rely on the intent to pay representation would result in the discharge of all card-debt incurred within at least the first month of use.  This would encourage dishonest debtors to reach their limits within the first billing cycle in order to preclude nondischargeability.  It could also have the unintended consequence of spurring issuers to establish such low initial limits that cards would serve *no* useful purpose to many cardholders.

(7)

Likewise, the fact that, 19 days after card-issuance, UCS flagged Mercer's account for excessive transactions does *not*

---

1996) (issuer's failure to investigate prior to increasing limit does *not* make reliance unjustifiable because debtor had history of responsible card use and issuer *not* aware of any red flags).

[50]*See* **Pickett**, 234 B.R. at 758-59 (justifiable reliance where debtor immediately obtained cash advances and filed bankruptcy before bi-monthly review could be made, issuer used appropriate screening practices, and received *no* warning of fraud or other irregularities in time to take action to prevent fraud; obtaining cash advances within limit was *not* warning issuer being deceived and should commence investigation).

preclude justifiable reliance. UCS' representative testified: UCS reviewed the account, decided the transactions were *not* egregiously excessive, and cleared the account for further use; and, because the charges were within the terms of the card-agreement, UCS was obligated to honor it. Reliance on this factor could encourage issuers to cancel cards if used frequently within the first billing cycle, regardless of whether the limit had been exceeded.

5.

Finally, UCS was required to prove loss proximately caused by reliance on Mercer's representations. *See* RESTATEMENT (SECOND) OF TORTS § 548A ("fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from .... reliance upon it if ... the loss might reasonably be expected to result from the reliance"). On remand, if the bankruptcy court finds Mercer fraudulently misrepresented her intent to pay *and* UCS justifiably relied on that misrepresentation, *then*, as a matter of law, UCS' loss (unpaid loan) resulted from the reliance. **Id**.[51]

III.

For Mercer's § 523(a)(2)(A) nondischargeability *vel non*, we hold, as a matter of law, for each card-use: she represented her

---

[51]*See, e.g.,* **Dietzel**, 245 B.R. at 755 (proof of damage *readily established* when debtor does *not* pay card-debt); **Sears, Roebuck & Co. v. McVicker**,**(In re McVicker)**, 234 B.R. 732, 740 (Bankr. E.D. Ark. 1999) (issuer suffered loss equal to unpaid charges, proximately caused by having justifiably relied on debtor's misrepresentation).

intent to pay the loan; *if her representation was knowingly false*, she intended to deceive UCS; it actually relied on the representation by authorizing the requested loan; and its loss was proximately caused by such reliance. On remand, to be determined for each representation is whether: it was *knowingly false*; and UCS *justifiably relied* on it.

Accordingly, the judgment of the district court is **REVERSED**, and the case is **REMANDED** to the district court, with instructions to **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

*REVERSED and REMANDED*

DUHÉ, Circuit Judge, joined by WIENER, DeMOSS, STEWART, and PARKER, Circuit Judges, dissenting:

I am firmly convinced that the majority errs when it adopts the fiction that, as a matter of law, each separate use of a pre-approved credit card constitutes a representation by the user of an intent to pay, and that, if it does, the credit card issuer may rely on those representations. I, therefore, respectfully dissent for the reasons set forth in the panel opinion, AT&T v. Mercer (In re Mercer), 211 F.3d 214 (5th Cir. 2000), and the following reasons. Mindful that dissents do little more than make the dissenter feel better, I shall state my reasons briefly.

The majority admits that a creditor must prove every element of its claim of nondischargeability by a preponderance of the evidence. But the majority has completely ignored the universally accepted and fundamental principle of bankruptcy law that exceptions to discharge must be narrowly construed in favor of the debtor. See, for example, Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir. 1998). The majority's omission effectively shifts the burden of proof and alters "'the balance of bankruptcy policy struck by section 523'". Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 448 (Bankr. W.D. Wis. 1996) (quoting Chase Manhattan Bank, N.A. v. Ford (In re Ford), 186 B.R. 312, 317 (Bankr. N.D. Ga. 1995)) ("To permit credit card plaintiffs to benefit from 'implications' is to engage in impermissible

burden-shifting.") <u>Briese</u>, 196 B.R. at 449. If one can "infer" a representation from use of the card, then the creditor is relieved of the obligation of proving that a false representation was made.

The majority also ignores a second universally accepted canon of construction: contracts should be construed so as to avoid neutralizing or ignoring any provisions or treating provisions as surplusage. <u>See</u>, <u>for example</u>, <u>Texas E. Transmission Corp. v. Amerada Hess Corp.</u>, 145 F.3d 737, 742 (5th Cir. 1998). The majority construes Mercer's credit agreement so as to neutralize completely its provisions obligating Mercer to repay AT&T for debts accumulated on the card.[52] Mercer represented in writing in the credit agreement, which she was required to accept before she used the card, that she intended to repay AT&T for credit extended through the card. The credit agreement embodied the entire agreement between Mercer and AT&T. Why, then, would Mercer undertake to represent each time she used her card that she intended to repay AT&T for its use? Though otherwise impressively thorough, the majority opinion does not answer this question. Indeed, the question cannot be answered because Mercer made no such representations. The majority's less-than-benign fiction that she did has an unfortunate consequence: it allows AT&T effectively to

---

[52] In other words, to ignore the essence of the credit agreement.

64

rewrite the credit agreement after the fact.  This is hardly the "narrow construction" the law requires.  As rewritten through the majority's legerdemain, moreover, the agreement between Mercer and AT&T clearly favors AT&T, since all agree that Mercer's violation of the credit agreement's requirement that she repay AT&T does not preclude discharge of her debt.

In my view, use of a credit card resembles the issuance of a check.  The Supreme Court has held, as the majority admits, that issuing a check in payment of a debt knowing that the account on which the check is drawn does not contain sufficient funds to cover the check is not a representation that there are funds sufficient to cover the check. It is in fact not a representation of anything. Williams v. United States, 458 U.S. 279, 284, 102 S. Ct. 3088, 3091, 73 L.Ed. 2d 767 (1982) ("[T]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false'").  In Williams, the defendant engaged in a check kiting scheme during which he presented to several federally insured banks checks on his accounts that greatly exceeded the funds in those accounts.  The Court held that by so doing, the defendant did not "make a false statement" because issuing the check was no statement at all.  Id.  The majority also discounts this holding because Williams was a criminal case and because a check simply orders funds to be transferred, but I fail

to see how these facts impact <u>Williams</u>'s holding that issuing the check is not a representation. The majority also discounts <u>Williams</u> on the basis that in it the Court was applying the rule of lenity. A simple reading of the opinion shows, however, that the rule of lenity did not affect the rationale for the holding, which the Court announced early in the opinion after thorough analysis. The Court in <u>Williams</u> only mentioned the rule of lenity in passing at the very end of the opinion after fully establishing the holding. If giving a check in payment of a debt is not a representation, then there is no justification in my view for holding, as the majority does, that using a credit card to obtain cash or make purchases is. This is particularly true in this case, where there was prior written representation of intent to repay. When a check is presented in payment of goods or services, or in exchange for cash, it simply authorizes the transfer of funds from the drawer's account to the merchant. Likewise, when a credit card is presented for the same purposes, it simply authorizes a transfer of funds from the card-holder's approved line of credit to the merchant, or to the card-holder in the case of the use of an ATM machine. <u>Williams</u>, therefore, applies here.

Interestingly, most of the courts that have adopted the implied representation theory have not considered <u>Williams</u>. <u>AT&T Universal Card Servs. v. Alvi (In re Alvi)</u>, 191 B.R. 724, 732

66

(Bankr. N.D. Ill. 1996). The similarities between the issuance of a check and the use of a credit card make it illogical, I submit, to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a check does not.

The majority incorrectly characterizes the relationship between AT&T and Mercer as a series of loans--i.e., a loan made each time the card was used. The majority, accordingly, concludes that "[h]er promise to pay occurred <u>not</u> when the line was established, but at card-use, when the loan was made." Opinion p. 19, lines 362-363. This conclusion is simply incorrect. Her promise to pay occurred when Mercer accepted the written credit agreement with AT&T, which states that the card holder is "responsible for all amounts owed on [the card holder's] [a]ccount...and [the card holder] agree[s] to pay such amounts according to the terms of the [a]greement." AT&T conditioned its offer of credit to Mercer on her promise to accept the credit agreement and furnish certain information (annual income, social security number, birth date, home and business telephone numbers and her maiden name), which promise she kept. As I noted above, AT&T agreed with Mercer at that time upon all terms and conditions that would inform her use of the card. So what occurred when she used the card, therefore, was simply the transfer of funds against

67

the credit line previously established and on the terms and conditions previously established. No new loan agreement was made and no new terms were agreed to. Hence, no new representations were made.

Although the panel opinion noted as much, this case implicates policy issues that, I think, merit another brief reference. AT&T offered Mercer a credit card and a $3,000 credit limit after conducting the cursory credit check described in the majority opinion on the condition that she return certain information, which she did, and that she accept the credit agreement, which she did. She was then free to use the card, subject to the terms and conditions of the agreement. Never did AT&T inquire about her prior credit card use, or the amount of her debt. Had it done so, Mercer's lack of creditworthiness would have been obvious. Now AT&T asks this Court to fashion a fiction to save it from the consequences of its own inadequate credit check, and, to my surprise, this Court has done so. This action, in my view, subverts the requirement that the creditor prove each element of the exception to discharge upon which it relies and the bedrock principle that exceptions to discharge must be narrowly construed in favor of the debtor.

Since I would hold that no implied representation was made, I would not reach the reliance issue.

DENNIS, Circuit Judge, dissenting.

Although I find Judge Duhé's dissenting opinion quite persuasive and am tempted to rest upon it, I dissent separately because I believe that this court should affirm the bankruptcy and district court judgments on the well-settled ground that there is no evidence in the record that AT&T took action in actual reliance upon each of Mercer's individual credit or cash draws on her line of credit. While I am uncertain about the analogy Judge Duhé draws between bank checks and credit card transactions, I agree with the reasoning of his dissent insofar as it demonstrates that there was no evidence of actual reliance on individual card transactions as representations in this case.

The Bankruptcy Code excepts from discharge certain debts resulting from "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In interpreting this provision the Supreme Court has looked to the concept of "actual fraud" as it was understood in 1978 when that language was added to § 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 70 (1995). For aid to that understanding the Court has relied on the Restatement (Second) of Torts (1976) published shortly before the Bankruptcy Reform Act of 1978. Id. "The section on point dealing with fraudulent misrepresentation states that both actual and justifiable reliance are required." Id. (internal quotation omitted) (citing RESTATEMENT (SECOND) OF TORTS § 537).

Section 537 of the Restatement (Second) of Torts provides: "The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable."  See also id. cmt. a ("If the recipient does not in fact rely on the misrepresentation, the fact that he takes some action that would be consistent with his reliance on it and as a result suffers pecuniary loss, does not impose any liability upon the maker."). Consequently, to deny Mercer a discharge of her credit card debt, AT&T was required to prove by a preponderance of the evidence that, inter alia, AT&T sustained a pecuniary loss from fraudulent misrepresentations by Mercer upon which AT&T in fact relied in taking action or refraining from action.  Proof by AT&T that it took some action that would be consistent with its reliance on an alleged misrepresentation, without proof of its actual reliance on the alleged misrepresentation, is not sufficient.

Because AT&T did not introduce any evidence to show that it actually relied on any of Mercer's alleged misrepresentations in taking or refraining from action, the bankruptcy court correctly refused to deny Mercer's discharge.[53]  The arguments by AT&T,

---

[53]There is no evidence that AT&T relied on an alleged misrepresentation in either "acting" or "refraining from action."

71

adopted by the majority, that AT&T took action in actual reliance on alleged misrepresentations implied by each of Mercer's individual draws on her line of credit are empty assertions. The record simply does not support a factual finding of any such reliance or action. The majority opinion wrongly reverses the decision of the bankruptcy court, which held that AT&T failed to prove that it actually relied on Ms. Mercer's individual credit purchases and ATM withdrawals in extending credit to her, because there is absolutely no evidence in the record that AT&T contemporaneously relied on the individual transactions in its decision to extend or to continue a three-thousand-dollar line of credit to her. The record evidence shows that AT&T relied solely on its own screening process and automated system in allowing Ms. Mercer to make cash and credit draws on her line of credit.

The majority opinion is badly mistaken in asserting that the testimony of AT&T's expert, Mr. Lewis, shows that AT&T relied on a supposed representation made during each use of Mercer's card in authorizing her to draw on the credit line. Maj. Op. at 28. When

---

The majority's theory is that AT&T "acted" by extending credit to Mercer in actual reliance on each individual draw she made on her credit line. The majority's theory is not that AT&T "refrained from action" in reliance upon misrepresentations. Therefore, for purposes of this dissent, I do not repeat "or refraining from action" at every point at which "act," action" or "acting" is mentioned.

72

read in context, his statement--to the effect that if AT&T had known Mercer would not pay the credit card charges, it would not have extended credit to her in the first place--was not made in reference to reliance upon Mercer's card use.  It clearly concerned the quality of the information AT&T had at the time it decided to issue a pre-approved card and extend a line of credit to Mercer, which of course occurred before she ever used her card.  Mr. Lewis made the statement after AT&T's counsel reviewed with him the six credit cards that Mercer obtained prior to receiving her AT&T card and the fact that Mercer had been screened three times by a credit bureau before her AT&T card was activated:

> Q.   <u>Based on AT&T's records with regard to this information</u>, would AT&T have extended credit to this defendant if it knew that she would not pay or did not have ability to pay for these charges on this account?
> A.    I would say no.
> Q.    Had any of those reports come back with negative information concerning delinquent payments, over limits, bankruptcy, that type of information, would she have been sent a solicitation offer?
> A.    No.

ROA, Vol. 5, pp. 123-124 (emphasis added).  The question put to Mr. Lewis clearly refers to the point in time when AT&T determined the credit limit it would offer to Ms. Mercer and accordingly "extended credit" to her by issuing a credit card in her name with that

73

limit.[54]  This line of questioning--discussing the effort AT&T expended by procuring credit reports before the credit card was issued--was meant, in the words of AT&T's counsel, "to dispel any notion that may exist that credit card companies in general go through the phone book and pull out a mailing list and send out applications or offers to people without regard to their creditworthiness."  Closing arguments of AT&T's counsel, ROA, p. 105.  In sum, Mr. Lewis never testified that AT&T relied in acting or refraining from action on the individual credit purchases and ATM withdrawals made by Ms. Mercer.    AT&T's decision and action in extending a three-thousand-dollar line of credit to Mercer was made in reliance upon AT&T's own research before she accepted AT&T's offer of credit.  AT&T v. Mercer, 220 B.R. 315, 326-327 (Bankr. S.D. Miss. 1998).   As Mr. Lewis testified before the bankruptcy judge:

> [W]hen we issue a solicitation or subsequently issue a card, it's based on--and again, some people may agree that it's not long enough, but it's based on at least a six or seven month study of that person's credit history and their ability to maintain their accounts. . . .
>     [Pre-approved credit card holders] have been eligible for a line [of credit] determined on their prior usage and history as stated [by] the [credit] bureau.

---

[54]The majority opinion misinterprets the words "extended credit" in the question as referring to what happened when Ms. Mercer made cash draws on her line of credit.

74

ROA, Vol. 5, p. 140-141. Later Mercer's counsel again stressed and Mr. Lewis agreed that the decision to act by extending a line of credit to Mercer was made in reliance upon AT&T's own research before it activated her credit card:

> Q.      So based on all these different reviews, analyses that's done and everything else, y'all determined that Ms. Mercer has the financial ability to handle a $3,000 unsecured credit line with your company, right?
> A.      Based on the information we had at the time, yes, sir.

ROA, Vol. 5, p. 159.

After Mercer accepted the credit card and began using it, AT&T did not take any action to extend her line of credit in contemporaneous reliance on each draw. Instead of looking at each transaction made by an individual like Mercer, AT&T set up its automated system to make quarterly credit evaluations of its customers, the results of which, along with information the company maintained about the promptness of payments, whether each customer stayed within his/her credit limit, and whether excessive use of a particular card was made within a period of time, formed the basis of AT&T's decisions regarding whether to terminate or continue cardholders' credit lines.[55] Each cash advance Mercer obtained was

---

[55]See closing arguments of AT&T's counsel before the bankruptcy judge, ROA pp. 106-107. In Mercer's case, AT&T had not yet performed a quarterly review of Mercer's credit when she exceeded her credit limit and was advised to discontinue using her card. A computerized program run for the purpose of monitoring excessive

made instantaneously from an ATM machine; no one at AT&T evaluated the transaction or relied on any implicit representation made by Mercer while using her card.

The testimony of AT&T's expert, Mr. Lewis, explaining how Mercer was allowed to make charges surpassing her credit limit without being cut off first by AT&T, proves that AT&T does not monitor each individual transaction while it is being made, therefore negating a finding that AT&T actually relies on any representation made during a specific transaction.

> Q.     Can you explain why [Mercer's final account balance] exceeds the [maximum] balance allowed on this account of $3,000?
> A.      . . .   The reason that there is an over limit charge on the account is that if you'll refer to page 1 and 2 of our statement you will see that the transaction dates reflect the date that the charge was made.  If you will refer to the posting date when we receive the charges from the merchants, in some cases there will be delays of three days, five days, two days; so although the charge has been made, if it is a floor limit charge it does not have to be called in or authorized by us to post to the account.  There is going to be a gap where all the charges[,] because we have not received them from that merchant[,] are posted to the customer's account,

---

usage of cards within a short period of time had, however, "red flagged" Mercer's account, and an AT&T associate evaluated her account activity as a result.  However, he "cleared" her account for continued use because, in the words of Mr. Lewis, "[the charges] were not overly excessive to thousands of dollars or things of that nature."  ROA, Vol. 5, pp. 93-94.  Again, however, these facts constituted evidence of AT&T's reliance on its own methodology and systems, not evidence of any reliance upon the card charges as implied representations.

which would enable the account to have new charge activity which could put it over the limit.

ROA Vol. 5, pp. 77-78. Mr. Lewis went on to explain that, even if a merchant requires authorization for a charge, such authorization does not involve reliance upon any representation that may be made by the cardholder at the time the card is used; instead: "[A]n authorization is basically an approval saying that at the time this charge was made there is sufficient credit available on the customer's credit line to let the charge be made." Id. at 78. Furthermore, as the majority opinion points out, AT&T was not aware that on several occasions

> when [Mercer] inserted her card into the ATM, she was in a casino. Instead, the billing statement reflects that, although Mercer obtained four advances at a casino on 23 and 24 November, they were not posted until 27 November. As [AT&T's] representative testified, that posting-date is when [AT&T] receives an electronic transfer notification from the clearing bank, which may be several days after the transaction.

Maj. Op. at 52-53 (emphasis omitted). Because AT&T was not aware of each transaction until several days after it occurred, AT&T could not have relied upon each individual draw on Mercer's credit line contemporaneously with its occurrence. Nor does the record contain any evidence to support findings that AT&T in fact engaged in action in reliance on each charge as it occurred.

Another telling line of questioning from AT&T's own counsel in the hearing before the bankruptcy court focuses on Mr. Lewis's

77

assertions that Mercer's uses of the card indicated her intent <u>not</u>

to repay the charges she was incurring:

> Q.      At the time that the debtor was using the card, having reviewed her duplicate account statements, what facts do you see in . . . her use of the card . . . that would lead you to believe that she lacked the requisite intent to repay this debt?
> A.      At the time of her usage of the card?
> Q.      Yes, sir.
> A.      [T]he fact of the location where the cash advances were taken, namely casinos. . . .
> Q.      So to further elaborate on some other items that might have been concerns to AT&T--was the number of charges made a concern?[56]
> A.      The number of charges in that one period of time, yes.
> Q.      The amount of the charges?
> A.      The amount of the charges, particularly since it took the account over the limit, yes.
> Q.      Would the fact that the debtor had made numerous transactions on the same day become a concern?
> A.      That would have been addressed in . . . [AT&T's internal report], where that came in as a possible alert.

ROA, Vol. 5, pp. 127-131.    It is highly improbable that AT&T

actually relied on these same card uses--which its expert testified

were indicative of a fraudulent intent not to repay the charges

incurred--in deciding to take the action of extending credit to

Mercer.

That AT&T utterly failed to prove actual reliance upon

anything while the charges were being made was unmistakably the

factual finding of the bankruptcy judge after hearing the evidence:

---

[56]Lewis testified that Mercer used the card 32 or 36 times in a 30-day period.  ROA, Vol. 5, p. 130.

> The evidence showed that prior to and subsequent to the issuance of the AT&T credit card to Mercer, several investigations and evaluations of Mercer's credit-worthiness were conducted by AT&T. . . . AT&T solely relied on its own agents and investigative processes to make its decision. <u>The evidence reflects nothing written, said or done by Mercer upon which AT&T relied at any time while the charges were being made</u>. . . .

220 B.R. 315 at 326-327 (emphasis added). Because this finding of fact was not clearly erroneous, the majority is manifestly wrong in setting it aside. "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Federal Rule of Civil Procedure 52(a). Because AT&T did not prove that it actually relied on a misrepresentation by Mercer in acting to extend or continue her line of credit, its suit to deny her discharge was correctly rejected and dismissed by the bankruptcy court. The fact that the bankruptcy court may have miss spoken or incorrectly stated a rule of law that did not affect substantial justice or the substantial rights of the parties must be disregarded. "[N]o error or defect in any ruling by the court . . . is ground for . . . disturbing a judgment . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the

substantial rights of the parties." Federal Rule of Civil Procedure 61.

The district court, therefore, was clearly correct in affirming the bankruptcy court's decision because there was no clear error in the bankruptcy judge's finding that AT&T failed to prove that it actually relied on any representations made by Mercer:

> [T]his Court finds that the lower court did not commit clear error in finding that "the evidence reflects nothing written, said or done by Mercer upon which AT&T relied at any time while the charges were being made" and that AT&T "solely relied on its own agents and investigative processes to make its decision" to issue the credit card. Without the requisite proof showing actual . . . reliance, the appellant's claim for nondischargeability does not meet the requirements for the false pretense or actual fraud prongs of 11 U.S.C. § 523(a)(2)(A).

Mem. Op. p. 9.

Consequently, the majority is doubly wrong in reversing the judgments of the bankruptcy and district courts. Furthermore, even if we were not legally bound to uphold, in the absence of clear error, the trial court's crucial finding of fact that AT&T did not actually rely on a misrepresentation by Mercer in taking action to extend or continue her line of credit, a thorough, objective review of the record shows that AT&T did not prove this element of its case. Therefore, because AT&T failed to prove the essential element of actual reliance this court should affirm the bankruptcy

80

and district courts without reaching the issues of representation and justifiable reliance.